## UNITED STATES *v.* LOVETT.

NO. 809.

Argued May 3, 6, 1946.—Decided June 3, 1946.

*Ralph F. Fuchs* argued the cause for the United States. With him on the brief were *Solicitor General McGrath, Assistant Attorney General Sonnett, David L. Kreeger* and *Joseph B. Goldman.*

*Charles A. Horsky* argued the cause for respondents. With him on the brief were *Edward B. Burling* and *Amy Ruth Mahin.*

By special leave of Court, *John C. Gall* argued the cause for the Congress of the United States, as *amicus curiae,* urging reversal. With him on the brief were *Dean Hill Stanley* and *Clark M. Robertson.*

*Robert W. Kenny* filed a brief for the National Lawyers Guild, as *amicus curiae,* urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

In 1943 the respondents, Lovett, Watson, and Dodd, were and had been for several years working for the Government. The government agencies which had lawfully

employed them were fully satisfied with the quality of their work and wished to keep them employed on their jobs. Over the protest of those employing agencies, Congress provided in § 304 of the Urgent Deficiency Appropriation Act of 1943, by way of an amendment attached to the House bill, that after November 15, 1943, no salary or compensation should be paid respondents out of any monies then or thereafter appropriated except for services as jurors or members of the armed forces, unless they were prior to November 15, 1943 again appointed to jobs by the President with the advice and consent of the Senate.[1] 57 Stat. 431, 450. Notwithstanding the congressional enactment, and the failure of the President to reappoint respondents, the agencies kept all the respondents at work on their jobs for varying periods after November 15, 1943; but their compensation was discontinued after that date. To secure compensation for this post-November 15th work, respondents brought these actions in the Court of

---

[1] Section 304 provides: "No part of any appropriation, allocation, or fund (1) which is made available under or pursuant to this Act, or (2) which is now, or which is hereafter made, available under or pursuant to any other Act, to any department, agency, or instrumentality of the United States, shall be used, after November 15, 1943, to pay any part of the salary, or other compensation for the personal services, of Goodwin B. Watson, William E. Dodd, Junior, and Robert Morss Lovett, unless prior to such date such person has been appointed by the President, by and with the advice and consent of the Senate: *Provided,* That this section shall not operate to deprive any such person of payment for leaves of absence or salary, or of any refund or reimbursement, which have accrued prior to November 15, 1943: *Provided further,* That this section shall not operate to deprive any such person of payment for services performed as a member of a jury or as a member of the armed forces of the United States nor any benefit, pension, or emolument resulting therefrom."

As we shall point out, the President signed the bill because he had to do so since the appropriated funds were imperatively needed to carry on the war. He felt, however, that § 304 of the bill was unconstitutional, and failed to reappoint respondents.

Claims. They urged that § 304 is unconstitutional and void on the grounds that: (1) The section, properly interpreted, shows a congressional purpose to exercise the power to remove executive employees, a power not entrusted to Congress but to the Executive Branch of Government under Article II, §§ 1, 2, 3, and 4 of the Constitution; (2) the section violates Article I, § 9, Clause 3, of the Constitution which provides that "No Bill of Attainder or ex post facto Law shall be passed"; (3) the section violates the Fifth Amendment, in that it singles out these three respondents and deprives them of their liberty and property without due process of law. The Solicitor General, appearing for the Government, joined in the first two of respondents' contentions but took no position on the third. House Resolution 386, 89 Cong. Rec. 10882, and Joint Resolution No. 230, 78th Congress, 58 Stat. 113, authorized a special counsel to appear on behalf of the Congress. This counsel denied all three of respondents' contentions. He urged that § 304 was a valid exercise of congressional power under Article I, § 8, Clause 1; § 8, Clause 18; and § 9, Clause 7 of the Constitution, which sections empower Congress "To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States," and "To make all Laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof," and provide that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . ." Counsel for Congress also urged that § 304 did not purport to terminate respondents' employment. According to him, it merely cut off respondents' pay and deprived governmental agencies of any power to make enforceable contracts with respondents for any further compensation. The contention was that this involved

simply an exercise of congressional powers over appropriations, which, according to the argument, are plenary and not subject to judicial review. On this premise counsel for Congress urged that the challenge of the constitutionality of § 304 raised no justiciable controversy. The Court of Claims entered judgments in favor of respondents. Some of the judges were of the opinion that § 304, properly interpreted, did not terminate respondents' employment, but only prohibited payment of compensation out of funds generally appropriated, and that, consequently, the continued employment of respondents was valid, and justified their bringing actions for pay in the Court of Claims. Other members of the Court thought § 304 unconstitutional and void, either as a bill of attainder, an encroachment on exclusive executive authority, or a denial of due process. 104 Ct. Cls. 557, 66 F. Supp. 142. We granted certiorari because of the manifest importance of the questions involved.

In this Court the parties and counsel for Congress have urged the same points as they did in the Court of Claims. According to the view we take we need not decide whether § 304 is an unconstitutional encroachment on executive power or a denial of due process of law, and the section is not challenged on the ground that it violates the First Amendment. Our inquiry is thus confined to whether the actions in the light of a proper construction of the Act present justiciable controversies; and, if so, whether § 304 is a bill of attainder against these respondents, involving a use of power which the Constitution unequivocally declares Congress can never exercise. These questions require an interpretation of the meaning and purpose of the section, which in turn requires an understanding of the circumstances leading to its passage. We, consequently, find it necessary to set out these circumstances somewhat in detail.

In the background of the statute here challenged lies the House of Representatives' feeling in the late thirties that many "subversives" were occupying influential positions in the Government and elsewhere and that their influence must not remain unchallenged. As part of its program against "subversive" activities the House in May 1938 created a Committee on Un-American Activities, which became known as the Dies Committee, after its Chairman, Congressman Martin Dies. H. Res. 282, 83 Cong. Rec. 7568–7587. This Committee conducted a series of investigations and made lists of people and organizations it thought "subversive." See e. g.: H. Rep. No. 1, 77th Cong., 1st Sess.; H. Rep. No. 2743, 77th Cong., 2d Sess. The creation of the Dies Committee was followed by provisions such as § 9A of the Hatch Act, 53 Stat. 1148, 1149, and §§ 15 (f) and 17 (b) of the Emergency Relief Appropriation Act of 1941, 54 Stat. 611, which forbade the holding of a federal job by anyone who was a·member of a political party or organization that advocated the overthrow of our constitutional form of Government in the United States. It became the practice to include a similar prohibition in all appropriations acts, together with criminal penalties for its violation.[2] Under these provisions the Federal Bureau of Investigation began wholesale investigations of federal employees, which investigations were financed by special congressional appropriations. 55 Stat. 292, 56 Stat. 468, 482. Thousands were investigated.

While all this was happening, Mr. Dies on February 1, 1943, in a long speech on the floor of the House attacked thirty-nine named government employees as "irresponsible, unrepresentative, crackpot, radical bureaucrats" and

[2] 55 Stat. 92, § 5; 55 Stat. 265, § 504; 55 Stat. 303, § 7; 55 Stat. 366, § 10; 55 Stat. 408, § 3; 55 Stat. 446, § 5; 55 Stat. 466, § 704; 55 Stat. 499, § 10; House Doc. 833, 77th Cong., 2d Sess.

affiliates of "Communist front organizations." Among these named individuals were the three respondents. Congressman Dies told the House that respondents, as well as the other thirty-six individuals he named, were because of their beliefs and past associations unfit to "hold a Government position" and urged Congress to refuse "to appropriate money for their salaries." In this connection he proposed that the Committee on Appropriations "take immediate and vigorous steps to eliminate these people from public office." 89 Cong. Rec. 474, 479, 486. Four days later an amendment was offered to the Treasury-Post Office Appropriation Bill which provided that "no part of any appropriation contained in this act shall be used to pay the compensation of" the thirty-nine individuals Dies had attacked. 89 Cong. Rec. 645. The Congressional Record shows that this amendment precipitated a debate that continued for several days. *Id.* 645–742. All of those participating agreed that the "charges" against the thirty-nine individuals were serious. Some wanted to accept Congressman Dies' statements as sufficient proof of "guilt," while others referred to such proposed action as "legislative lynching," *id.* at 651, smacking "of the procedure in the French Chamber of Deputies, during the Reign of Terror." *Id.* at 654. The Dies charges were referred to as "indictments," and many claimed this made it necessary that the named federal employees be given a hearing and a chance to prove themselves innocent. *Id.* at 711. Congressman Dies then suggested that the Appropriations Committee "weigh the evidence and . . . take immediate steps to dismiss these people from the Federal service." *Id.* at 651. Eventually a resolution was proposed to defer action until the Appropriations Committee could investigate, so that accused federal employees would get a chance to prove themselves "innocent" of communism or disloyalty, and so that each "man would

have his day in court," and "There would be no star chamber proceedings." *Id.* at 711 and 713; but see *id.* at 715. The resolution which was finally passed authorized the Appropriations Committee acting through a special subcommittee ". . . to examine into any and all allegations or charges that certain persons in the employ of the several executive departments and other executive agencies are unfit to continue in such employment by reason of their present association or membership or past association or membership in or with organizations whose aims or purposes are or have been subversive to the Government of the United States." *Id.* at 734, 742. The Committee was to have full plenary powers, including the right to summon witnesses and papers, and was to report its "findings and determination" to the House. It was authorized to attach legislation recommended by it to any general or special appropriation measure, notwithstanding general House rules against such practice. *Id.* at 734. The purpose of the resolution was thus described by the Chairman of the Committee on Appropriations in his closing remarks in favor of its passage: "The third and the really important effect is that we will expedite adjudication and disposition of these cases and thereby serve both the accused and the Government. These men against whom charges are pending are faced with a serious situation. If they are not guilty they are entitled to prompt exoneration; on the other hand, if they are guilty, then the quicker the Government removes them the sooner and the more certainly will we protect the Nation against sabotage and fifth-column activity." *Id.* at 741.

After the resolution was passed, a special subcommittee of the Appropriations Committee held hearings in secret executive session. Those charged with "subversive" beliefs and "subversive" associations were permitted to testify, but lawyers, including those representing the agen-

cies by which the accused were employed, were not permitted to be present. At the hearings, committee members, the committee staff, and whatever witness was under examination were the only ones present. The evidence, aside from that given by the accused employees, appears to have been largely that of reports made by the Dies Committee, its investigators, and Federal Bureau of Investigation reports, the latter being treated as too confidential to be made public.

After this hearing, the subcommittee's reports and recommendations were submitted to the House as part of the Appropriation Committee's report. The subcommittee stated that it had regarded the investigations "as in the nature of an inquest of office" with the ultimate purpose of purging the public service of anyone found guilty of "subversive activity." The committee, stating that "subversive activity" had not before been defined by Congress or by the courts, formulated its own definition of "subversive activity" which we set out in the margin.[3] Respondents Watson, Dodd, and Lovett were, according to the subcommittee, guilty of having engaged in "subversive activity within the definition adopted by the committee." H. Rep. No. 448, 78th Cong., 1st Sess., 5–7, 9. The ultimate finding and recommendation as to respondent Watson, which was substantially similar to the findings with respect to Lovett and Dodd, read as follows: "Upon consideration of all of the evidence, your committee finds that the membership and association of Dr. Goodwin B. Watson with the organizations mentioned,

---

[3] "Subversive activity in this country derives from conduct intentionally destructive of or inimical to the Government of the United States—that which seeks to undermine its institutions, or to distort its functions, or to impede its projects, or to lessen its efforts, the ultimate end being to overturn it all. Such activity may be open and direct as by effort to overthrow, or subtle and indirect as by sabotage." H. Rep. No. 448, 78th Cong., 1st Sess., p. 5.

and his views and philosophies as expressed in various statements and writings constitute subversive activity within the definition adopted by your committee, and that he is, therefore, unfit for the present to continue in Government employment." H. Rep. No. 448, 78th Cong., 1st Sess., p. 6. As to Lovett the Committee further reported that it had rejected a "strong appeal" from the Secretary of the Interior for permission to retain Lovett in government service, because as the Committee stated, it could not "escape the conviction that this official is unfit to hold a position of trust with this Government by reason of his membership, association, and affiliation with organizations whose aims and purposes are subversive to the Government of the United States." *Id.* at 12.

Section 304 was submitted to the House along with the Committee Report. Congressman Kerr, who was chairman of the subcommittee, stated that the issue before the House was simply: ". . . whether or not the people of this country want men who are not in sympathy with the institutions of this country to run it." He said further: ". . . these people under investigation have no property rights in these offices. One Congress can take away their rights given them by another." 89 Cong. Rec. 4583. Other members of the House during several days of debate bitterly attacked the measure as unconstitutional and unwise. *Id.* at 4482–4487, 4546–4556, 4581–4605. Finally § 304 was passed by the House.

The Senate Appropriation Committee eliminated § 304 and its action was sustained by the Senate. 89 Cong. Rec. 5024. After the first conference report which left the matter still in disagreement the Senate voted 69 to 0 against the conference report which left § 304 in the bill. The House, however, insisted on the amendment and indicated that it would not approve any appropriation bill without § 304. Finally, after the fifth conference report

showed that the House would not yield, the Senate adopted § 304. When the President signed the bill he stated: "The Senate yielded, as I have been forced to yield, to avoid delaying our conduct of the war. But I cannot so yield without placing on record my view that this provision is not only unwise and discriminatory, but unconstitutional." H. Doc. 264, 78th Cong., 1st Sess.

## I.

In view of the facts just set out, we cannot agree with the two judges of the Court of Claims who held that § 304 required "a mere stoppage of disbursing routine, nothing more," and left the employer governmental agencies free to continue employing respondents and to incur contractual obligations by virtue of such continued work which respondents could enforce in the Court of Claims. Nor can we agree with counsel for Congress that the section did not provide for the dismissal of respondents but merely forbade governmental agencies to compensate respondents for their work or to incur obligations for such compensation at any and all times. We therefore cannot conclude, as he urges, that § 304 is a mere appropriation measure, and that, since Congress under the Constitution has complete control over appropriations, a challenge to the measure's constitutionality does not present a justiciable question in the courts, but is merely a political issue over which Congress has final say.

We hold that the purpose of § 304 was not merely to cut off respondents' compensation through regular disbursing channels but permanently to bar them from government service, and that the issue of whether it is constitutional is justiciable. The section's language as well as the circumstances of its passage which we have just described show that no mere question of compensation procedure or of appropriations was involved, but that it

was designed to force the employing agencies to discharge respondents and to bar their being hired by any other governmental agency. Cf. *United States* v. *Dickerson,* 310 U. S. 554. Any other interpretation of the section would completely frustrate the purpose of all who sponsored § 304, which clearly was to "purge" the then existing and all future lists of government employees of those whom Congress deemed guilty of "subversive activities" and therefore "unfit" to hold a federal job. What was challenged, therefore, is a statute which, because of what Congress thought to be their political beliefs, prohibited respondents from ever engaging in any government work, except as jurors or soldiers. Respondents claimed that their discharge was unconstitutional; that they consequently rightfully continued to work for the Government and that the Government owes them compensation for services performed under contracts of employment. Congress has established the Court of Claims to try just such controversies. What is involved here is a congressional proscription of Lovett, Watson, and Dodd, prohibiting their ever holding a government job. Were this case to be not justiciable, congressional action, aimed at three named individuals, which stigmatized their reputation and seriously impaired their chance to earn a living, could never be challenged in any court. Our Constitution did not contemplate such a result. To quote Alexander Hamilton, ". . . a limited constitution . . . [is] one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no *ex post facto* laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." Federalist Paper No. 78.

## II.

We hold that § 304 falls precisely within the category of congressional actions which the Constitution barred by providing that "No Bill of Attainder or ex post facto Law shall be passed." In *Cummings* v. *Missouri,* 4 Wall. 277, 323, this Court said, "A bill of attainder is a legislative act which inflicts punishment without a judicial trial. If the punishment be less than death, the act is termed a bill of pains and penalties. Within the meaning of the Constitution, bills of attainder include bills of pains and penalties." The *Cummings* decision involved a provision of the Missouri Reconstruction Constitution which required persons to take an Oath of Loyalty as a prerequisite to practicing a profession. Cummings, a Catholic Priest, was convicted for teaching and preaching as a minister without taking the oath. The oath required an applicant to affirm that he had never given aid or comfort to persons engaged in hostility to the United States and had never "been a member of, or connected with, any order, society, or organization, inimical to the government of the United States . . ." In an illuminating opinion which gave the historical background of the constitutional prohibition against bills of attainder, this Court invalidated the Missouri constitutional provision both because it constituted a bill of attainder and because it had an *ex post facto* operation. On the same day the *Cummings* case was decided, the Court, in *Ex parte Garland,* 4 Wall. 333, also held invalid on the same grounds an Act of Congress which required attorneys practicing before this Court to take a similar oath. Neither of these cases has ever been overruled. They stand for the proposition that legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Con-

stitution. Adherence to this principle requires invalidation of § 304. We do adhere to it.

Section 304 was designed to apply to particular individuals.[4] Just as the statute in the two cases mentioned, it "operates as a legislative decree of perpetual exclusion" from a chosen vocation. *Ex parte Garland, supra,* at 377. This permanent proscription from any opportunity to serve the Government is punishment, and of a most severe type. It is a type of punishment which Congress has only invoked for special types of odious and dangerous crimes, such as treason, 18 U. S. C. 2; acceptance of bribes by members of Congress, 18 U. S. C. 199, 202, 203; or by other government officials, 18 U. S. C. 207; and interference with elections by Army and Navy officers, 18 U. S. C. 58.

Section 304, thus, clearly accomplishes the punishment of named individuals without a judicial trial. The fact that the punishment is inflicted through the instrumentality of an Act specifically cutting off the pay of certain named individuals found guilty of disloyalty, makes it no less galling or effective than if it had been done by an Act which designated the conduct as criminal.[5] No one would think that Congress could have passed a valid law, stating that after investigation it had found Lovett, Dodd, and Watson "guilty" of the crime of engaging in "subversive activities," defined that term for the first time, and sentenced them to perpetual exclusion from any government employment. Section 304, while it does not use that language, accomplishes that result. The effect was to inflict punishment without the safeguards of a judicial trial and

---

[4] This is of course one of the usual characteristics of bills of attainder. See Wooddeson, Law Lectures: A Systematical View of the Laws of England (1792), No. 41, 622.

[5] See *Cummings* v. *Missouri, supra,* 4 Wall. at 325, 329; see also *Fletcher* v. *Peck,* 6 Cranch 87, 138–139; *Burgess* v. *Salmon,* 97 U. S. 381, 385.

"determined by no previous law or fixed rule." [6]   The Constitution declares that that cannot be done either by a State or by the United States.

Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons because the legislature thinks them guilty of conduct which deserves punishment.   They intended to safeguard the people of this country from punishment without trial by duly constituted courts.   See *Duncan* v. *Kahanamoku,* 327 U. S. 304.   And even the courts to which this important function was entrusted were commanded to stay their hands until and unless certain tested safeguards were observed.   An accused in court must be tried by an impartial jury, has a right to be represented by counsel, he must be clearly informed of the charge against him, the law which he is charged with violating must have been passed before he committed the act charged, he must be confronted by the witnesses against him, he must not be compelled to incriminate himself, he cannot twice be put in jeopardy for the same offense, and even after conviction

---

[6] See dissent of Mr. Justice Miller in *Cummings* v. *Missouri, supra,* 4 Wall. at 388; see also Wooddeson, *supra,* at 624, 638 *et seq.*   Section 304 has all the characteristics of bills of attainder, even as they are set out by Justice Miller's dissent, except the corruption of blood. 4 Wall. at 387.   The American precedents do not consider corruption of blood a necessary element.   Originally a judgment of death was necessary to attaint and the consequences of attainder were forfeiture and corruption of blood.   Coke, First Institute (on Littleton) (Thomas Ed. 1818) Vol. III, 559, 563, 565.   If the judgment was lesser punishment than death, there was no attaint and the bill was one of pains and penalties.   Practically all the American precedents are bills of pains and penalties.   See Thompson, Anti-Loyalist Legislation During the American Revolution (1908) 3 Ill. L. Rev. 81, 153 *et passim;* John C. Hamilton, History of the Republic of the United States (1859) Vol. III, 23–40.   The Constitution in prohibiting bills of attainder undoubtedly included bills of pains and penalties, as the majority in the *Cummings* case held.

no cruel and unusual punishment can be inflicted upon him. See *Chambers* v. *Florida,* 309 U. S. 227, 235–238. When our Constitution and Bill of Rights were written, our ancestors had ample reason to know that legislative trials and punishments were too dangerous to liberty to exist in the nation of free men they envisioned. And so they proscribed bills of attainder. Section 304 is one. Much as we regret to declare that an Act of Congress violates the Constitution, we have no alternative here.

Section 304 therefore does not stand as an obstacle to payment of compensation to Lovett, Watson, and Dodd. The judgment in their favor is

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE REED joins, concurring.

Nothing would be easier than personal condemnation of the provision of the Urgent Deficiency Appropriation Act of 1943 here challenged. § 304, 57 Stat. 431, 450.[1]

---

[1] "SEC. 304. No part of any appropriation, allocation, or fund (1) which is made available under or pursuant to this Act, or (2) which is now, or which is hereafter made, available under or pursuant to any other Act, to any department, agency, or instrumentality of the United States, shall be used, after November 15, 1943, to pay any part of the salary, or other compensation for the personal services, of Goodwin B. Watson, William E. Dodd, Junior, and Robert Morss Lovett, unless prior to such date such person has been appointed by the President, by and with the advice and consent of the Senate: *Provided,* That this section shall not operate to deprive any such person of payment for leaves of absence or salary, or of any refund or reimbursement, which have accrued prior to November 15, 1943: *Provided further,* That this section shall not operate to deprive any such person of payment for services performed as a member of a jury or as a member of the armed forces of the United States nor any benefit, pension, or emolument resulting therefrom."

But the judicial function exacts considerations very different from those which may determine a vote in Congress for or against a measure. And what may be decisive for a Presidential disapproval may not at all satisfy the established criteria which alone justify this Court's striking down an act of Congress.

It is not for us to find unconstitutionality in what Congress enacted although it may imply notions that are abhorrent to us as individuals or policies we deem harmful to the country's well-being. Although it was proposed at the Constitutional Convention to have this Court share in the legislative process, the Framers saw fit to exclude it. And so "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, K. & T. R. Co.* v. *May,* 194 U. S. 267, 270. This admonition was uttered by Mr. Justice Holmes in one of his earliest opinions and it needs to be recalled whenever an exceptionally offensive enactment tempts the Court beyond its strict confinements.

Not to exercise by indirection authority which the Constitution denied to this Court calls for the severest intellectual detachment and the most alert self-restraint. The scrupulous observance, with some deviations, of the professed limits of this Court's power to strike down legislation has been, perhaps, the one quality the great judges of the Court have had in common. Particularly when Congressional legislation is under scrutiny, every rational trail must be pursued to prevent collision between Congress and Court. For Congress can readily mend its ways, or the people may express disapproval by choosing different representatives. But a decree of unconstitutionality by this Court is fraught with consequences so enduring and far-reaching as to be avoided unless no choice is left in reason.

The inclusion of § 304 in the Appropriation Bill undoubtedly raises serious constitutional questions. But the most fundamental principle of constitutional adjudication is not to face constitutional questions but to avoid them, if at all possible. And so the "Court developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." Brandeis, J., concurring, in *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 341, at 346. That a piece of legislation under scrutiny may be widely unpopular is as irrelevant to the observance of these rules for abstention from avoidable adjudications as that it is widely popular. Some of these rules may well appear over-refined or evasive to the laity. But they have the support not only of the profoundest wisdom. They have been vindicated, in conspicuous instances of disregard, by the most painful lessons of our constitutional history.

Such are the guiding considerations enjoined by constitutional principles and the best practice for dealing with the various claims of unconstitutionality so ably pressed upon us at the bar.

The Court reads § 304 as though it expressly discharged respondents from office which they held and prohibited them from holding any office under the Government in the future. On the basis of this reading the Court holds that the provision is a bill of attainder in that it "inflicts punishment without a judicial trial," *Cummings* v. *Missouri*, 4 Wall. 277, 323, and is therefore forbidden by Article I, § 9 of the Constitution. Congress is said to have inflicted this punishment upon respondents because it disapproved the beliefs they were thought to hold. Such a colloquial treatment of the statute neglects the relevant canons of constitutional adjudication and disregards those

features of the legislation which call its validity into question on grounds other than inconsistency with the prohibition against bills of attainder. To characterize an act of Congress as a bill of attainder readily enlists, however, the instincts of a free people who are committed to a fair judicial process for the determination of issues affecting life, liberty, or property and naturally abhor anything that resembles legislative determination of guilt and legislative punishment. As I see it, our duty precludes reading § 304 as the Court reads it. But even if it were to be so read the provision is not within the constitutional conception of a bill of attainder.

Broadly speaking, two types of constitutional claims come before this Court. Most constitutional issues derive from the broad standards of fairness written into the Constitution (*e. g.* "due process," "equal protection of the laws," "just compensation"), and the division of power as between States and Nation. Such questions, by their very nature, allow a relatively wide play for individual legal judgment. The other class gives no such scope. For this second class of constitutional issues derives from very specific provisions of the Constitution. These had their source in definite grievances and led the Fathers to proscribe against recurrence of their experience. These specific grievances and the safeguards against their recurrence were not defined by the Constitution. They were defined by history. Their meaning was so settled by history that definition was superfluous. Judicial enforcement of the Constitution must respect these historic limits.

The prohibition of bills of attainder falls of course among these very specific constitutional provisions. The distinguishing characteristic of a bill of attainder is the substitution of legislative determination of guilt and legislative imposition of punishment for judicial finding and

sentence. "A bill of attainder, by the common law, as our fathers imported it from England and practised it themselves, before the adoption of the Constitution, was an act of sovereign power, in the form of a special statute . . . by which a man was pronounced guilty or attainted of some crime, and punished by deprivation of his vested rights, without trial or judgment *per legem terrae.*" Farrar, *Manual of the Constitution* (1867) 419. And see 2 Story, *Commentaries on the Constitution* (5th ed., 1891) 216; 1 Cooley, *Constitutional Limitations* (8th ed., 1927) 536. It was this very special, narrowly restricted, intervention by the legislature, in matters for which a decent regard for men's interests indicated a judicial trial, that the Constitution prohibited. It must be recalled that the Constitution was framed in an era when dispensing justice was a well-established function of the legislature. The prohibition against bills of attainder must be viewed in the background of the historic situation when moves in specific litigation that are now the conventional and, for the most part, the exclusive concern of courts were commonplace legislative practices. See *Calder* v. *Bull*, 3 Dall. 386; *Wilkinson* v. *Leland,* 2 Pet. 627, 660; *Baltimore & Susquehanna R. Co.* v. *Nesbit,* 10 How. 395; Pound, *Justice According to Law,* II (1914) 14 Col. L. Rev. 1–12; Woodruff, *Chancery in Massachusetts* (1889) 5 L. Q. Rev. 370. *Cf. Sinking-Fund Cases,* 99 U. S. 700. Bills of attainder were part of what now are staple judicial functions which legislatures then exercised. It was this part of their recognized authority which the Constitution prohibited when it provided that "No Bill of Attainder . . . shall be passed." Section 304 lacks the characteristics of the enactments in the Statutes of the Realm and the Colonial Laws that bear the hallmarks of bills of attainder.

All bills of attainder specify the offense for which the attainted person was deemed guilty and for which the

punishment was imposed. There was always a declaration of guilt either of the individual or the class to which he belonged. The offense might be a pre-existing crime or an act made punishable *ex post facto*. Frequently a bill of attainder was thus doubly objectionable because of its *ex post facto* features. This is the historic explanation for uniting the two mischiefs in one clause—"No Bill of Attainder or ex post facto Law shall be passed." No one claims that § 304 is an *ex post facto* law. If it is in substance a punishment for acts deemed "subversive" (the statute, of course, makes no such charge) for which no punishment had previously been provided, it would clearly be *ex post facto*. Therefore, if § 304 is a bill of attainder it is also an *ex post facto* law. But if it is not an *ex post facto* law, the reasons that establish that it is not are persuasive that it cannot be a bill of attainder. No offense is specified and no declaration of guilt is made. When the framers of the Constitution proscribed bills of attainder, they referred to a form of law which had been prevalent in monarchical England and was employed in the colonies. They were familiar with its nature; they had experienced its use; they knew what they wanted to prevent. It was not a law unfair in general, even unfair because affecting merely particular individuals, that they outlawed by the explicitness of their prohibition of bills of attainder. "Upon this point a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349. Nor should resentment against an injustice displace controlling history in judicial construction of the Constitution.

Not only does § 304 lack the essential declaration of guilt. It likewise lacks the imposition of punishment in the sense appropriate for bills of attainder. The punishment imposed by the most dreaded bill of attainder was of course death; lesser punishments were imposed by similar bills more technically called bills of pains and pen-

alties. The Constitution outlaws this entire category of punitive measures. *Fletcher* v. *Peck,* 6 Cranch 87, 138; *Cummings* v. *Missouri,* 4 Wall. 277. The amount of punishment is immaterial to the classification of a challenged statute. But punishment is a prerequisite.

Punishment presupposes an offense, not necessarily an act previously declared criminal, but an act for which retribution is exacted. The fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed. But there may be reasons other than punitive for such deprivation. A man may be forbidden to practice medicine because he has been convicted of a felony, *Hawker* v. *New York,* 170 U. S. 189, or because he is no longer qualified, *Dent* v. *West Virginia,* 129 U. S. 114. "The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact." *Cummings* v. *Missouri,* 4 Wall. 277, 320.

Is it clear then that the respondents were removed from office, still accepting the Court's reading of the statute, as a punishment for past acts? Is it clear, that is, to that degree of certitude which is required before this Court declares legislation by Congress unconstitutional? The disputed section does not say so. So far as the House of Representatives is concerned, the Kerr Committee, which proposed the measure, and many of those who voted in favor of the Bill (assuming it is appropriate to go behind the terms of a statute to ascertain the unexpressed motive of its members), no doubt considered the respondents "subversive" and wished to exclude them from the Government because of their past associations and their present views. But the legislation upon which we now pass judgment is the product of both Houses of Congress

and the President. The Senate five times rejected the substance of § 304. It finally prevailed, not because the Senate joined in an unexpressed declaration of guilt and retribution for it, but because the provision was included in an important appropriation bill. The stiffest interpretation that can be placed upon the Senate's action is that it agreed to remove the respondents from office (still assuming the Court's interpretation of § 304) without passing any judgment on their past conduct or present views.

Section 304 became law by the President's signature. His motive in allowing it to become law is free from doubt. He rejected the notion that the respondents were "subversive," and explicitly stated that he wished to retain them in the service of the Government. H. Doc. No. 264, 78th Cong., 1st Sess. Historically, Parliament passed bills of attainder at the behest of the monarch. See Adams, *Constitutional History of England* (Rev. ed., 1935) 228–29. The Constitution, of course, provides for the enactment of legislation even against disapproval by the Executive. But to hold that a measure which did not express a judgment of condemnation by the Senate and carried an affirmative disavowal of such condemnation by the President constitutes a bill of attainder, disregards the historic tests for determining what is a bill of attainder. At the least, there are such serious objections to finding § 304 a bill of attainder that it can be declared unconstitutional only by a failure to observe that this Court reaches constitutional invalidation only through inescapable necessity. "It must be evident to anyone that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility." 1 Cooley, *Constitutional Limitations* (8th ed., 1927) 332.

But even if it be agreed, for purposes of characterizing the deprivation of the statute as punishment, that the motive of Congress was past action of the respondents, presumed motive cannot supplant expressed legislative judgment. "The expectations of those who sought the enactment of legislation may not be used for the purpose of affixing to legislation when enacted a meaning which it does not express." *United States* v. *Goelet*, 232 U. S. 293, 298. Congress omitted from § 304 any condemnation for which the presumed punishment was a sanction. Thereby it negatived the essential notion of a bill of attainder. It may be said that such a view of a bill of attainder offers Congress too easy a mode of evading the prohibition of the Constitution. Congress need merely omit its ground of condemnation and legislate the penalty! But the prohibition against a "Bill of Attainder" is only one of the safeguards of liberty in the arsenal of the Constitution. There are other provisions in the Constitution, specific and comprehensive, effectively designed to assure the liberties of our citizens. The restrictive function of this clause against bills of attainder was to take from the legislature a judicial function which the legislature once possessed. If Congress adopted, as it did, a form of statute so lacking in any pretension to the very quality which gave a bill of attainder its significance, that of a declaration of guilt under circumstances which made its determination grossly unfair, it simply passed an act which this Court ought not to denounce as a bill of attainder. And not the less so because Congress may have been conscious of the limitations which the Constitution has placed upon it against passing bills of attainder. If Congress chooses to say that men shall not be paid, or even that they shall be removed from their jobs, we cannot decide that Congress also said that they are guilty of an offense. And particularly we cannot so decide as a

necessary assumption for declaring an act of Congress invalid. Congress has not legislated that which is attributed to it, for the simple fact is that Congress has said nothing. The words Congress used are not susceptible of being read as a legislative verdict of guilt against the respondents no matter what dictionary, or what form of argumentation, we use as aids.

This analysis accords with our prior course of decision. In *Cummings* v. *Missouri, supra,* and *Ex parte Garland,* 4 Wall. 333, the Court dealt with legislation of very different scope and significance from that now before us. While the provisions involved in those cases did not condemn or punish specific persons by name, they proscribed all guilty of designated offenses. Refusal to take a prescribed oath operated as an admission of guilt and automatically resulted in the disqualifying punishment. Avoidance of legislative proscription for guilt under the provisions in the *Cummings* and *Garland* cases required positive exculpation. That the persons legislatively punished were not named was a mere detail of identification. Congress and the Missouri legislature, respectively, had provided the most effective method for insuring identification. These enactments followed the example of English bills of attainder which condemned a named person and "his adherents." Section 304 presents a situation wholly outside the ingredients of the enactments that furnished the basis for the *Cummings* and *Garland* decisions.[2]

While § 304 is not a bill of attainder, as the gloss of history defines that phrase in the Constitution, acceptance of the Court's reading of § 304 would raise other serious

---

[2] Even against the holding that such enactments were bills of attainder, Mr. Justice Miller wrote the powerful dissent concurred in by Mr. Chief Justice Chase, Mr. Justice Swayne, and Mr. Justice Davis. 4 Wall. 333, 382.

constitutional questions. The first in magnitude and difficulty derives from the constitutional distribution of power over removal. For about a century this Court astutely avoided adjudication of the power of control as between Congress and the Executive of those serving in the Executive branch of the Government "until it should be inevitably presented." *Myers* v. *United States,* 272 U. S. 52, 173. The Court then gave the fullest consideration to the problem. The case was twice argued and was under consideration for nearly three years. So far as the issues could be foreseen they were elaborately dealt with in opinions aggregating nearly two hundred pages. Within less than a decade an opinion of fifteen pages largely qualified what the *Myers* case had apparently so voluminously settled. *Humphrey's Executor* v. *United States,* 295 U. S. 602. This experience serves as a powerful reminder of the Court's duty so to deal with Congressional enactments as to avoid their invalidation unless a road to any other decision is barred.

The other serious problem the Court's interpretation of § 304 raises is that of due process. In one aspect this is another phase of the constitutional issue of the removal power. For, if § 304 is to be construed as a removal from office, it cannot be determined whether singling out three government employees for removal violated the Fifth Amendment until it is decided whether Congress has a removal power at all over such employees and how extensive it is. Even if the statute be read as a mere stoppage of disbursement, the question arises whether Congress can treat three employees of the Government differently from all others. But that question we do not have to answer. In any event, respondents are entitled to recover in this suit and their remedy—a suit in the Court of Claims—is the same whatever view one takes of the legal significance of § 304. To be sure, § 304 also purports to prescribe con-

ditions relating to future employment of respondents by the Government. This too is a question not now open for decision. Reemployment by any agency of the Government, or the desire for reemployment, is not now in controversy, "and consequently the subject may well be postponed until it actually arises for decision." *Wilson* v. *New,* 243 U. S. 332, 354. The "great gravity and delicacy" of this Court's function in passing upon the validity of an act of Congress is called into action only when absolutely necessary. *Steamship Co.* v. *Emigration Commissioners,* 113 U. S. 33, 39. It should not be exercised on the basis of imaginary and non-existent facts. See Brandeis, J., concurring, in *Ashwander* v. *Tennessee Valley Authority, supra,* at 338–45.

Since it is apparent that grave constitutional doubts will arise if we adopt the construction the Court puts on § 304, we ought to follow the practice which this Court has established from the time of Chief Justice Marshall. The approach appropriate to such a case as the one before us was thus summarized by Mr. Justice Holmes in a similar situation: ". . . the rule is settled that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act. Even to avoid a serious doubt the rule is the same. *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407, 408. *United States* v. *Standard Brewery,* 251 U. S. 210, 220. *Texas* v. *Eastern Texas R. R. Co.,* 258 U. S. 204, 217. *Bratton* v. *Chandler,* 260 U. S. 110, 114. *Panama R. R. Co.* v. *Johnson,* 264 U. S. 375, 390. Words have been strained more than they need to be strained here in order to avoid that doubt. *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401, 402." *Blodgett* v. *Holden,* 275 U. S. 142, 148. " 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of con-

stitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' *Crowell* v. *Benson,* 285 U. S. 22, 62." Brandeis, J., concurring, in *Ashwander* v. *Tennessee Valley Authority, supra,* at 348.

We are not faced inescapably with the necessity of adjudicating these serious constitutional questions. The obvious or, at the least, the one certain construction of § 304 is that it forbids the disbursing agents of the Treasury to pay out of specifically appropriated moneys sums to compensate respondents for their services. We have noted the cloud cast upon this interpretation by manifestations by committees and members of the House of Representatives before the passage of this section. On the other hand, there is also much in the debates not only in the Senate but also in the House which supports the mere fiscal scope to be given to the statute. That such a construction is tenable settles our duty to adopt it and to avoid determination of constitutional questions of great seriousness.

Accordingly, I feel compelled to construe § 304 as did Mr. Chief Justice Whaley below, 104 Ct. Cls. 557, 584, 66 F. Supp. 142, 147–148, whereby it merely prevented the ordinary disbursal of money to pay respondents' salaries. It did not cut off the obligation of the Government to pay for services rendered and the respondents are, therefore, entitled to recover the judgment which they obtained from the Court of Claims.