**CERTIFIED BLOOD DONOR SERV-
ICES, INC.**

v.

**UNITED STATES.**

C. D. 4509; Court No. 68/54415–21133–68.

United States Customs Court.

April 3, 1974.

Sharretts, Paley, Carter & Blauvelt, New York City (Eugene F. Blauvelt and Gail T. Cumins, New York City, of counsel), for plaintiff.

Carla A. Hills, Asst. Atty. Gen. (James Caffentzis, New York City, trial atty.), for defendant.

NEWMAN, Judge:

We are faced with a case, conceptually technical, concerning the dutiable status of certain rabbit antisera imported by plaintiff from West Germany in 1968. The merchandise was assessed with duty at the rate of 9 per centum ad valorem under the provision in item 799.00 of the Tariff Schedules of the United States (TSUS) for "Other" articles not provided for elsewhere in the tariff schedules. Plaintiff claims that the merchandise is free of duty under the provision in item 437.76, TSUS, for "Viruses, therapeutic serums, vaccines, toxins, anti-toxins, and analogous biological products".

For the reasons stated below, the protest is overruled.

### THE RECORD

Counsel for the parties orally stipulated at the trial that at the time of importing the antisera no license was issued or required pursuant to the Public Health Service Act of July 1, 1944, as amended, 42 U.S.C. § 262. See footnote 4.

Stephan E. Ritzmann, M.D., called as a witness on behalf of plaintiff, was Director of the Division of Experimental Pathology and Immunology, and Codirector of the Transplantation Immunology Laboratory at the University of Texas Medical Branch. Dr. Ritzmann specializes and is an expert in the fields

employer, who demanded an explanation. After hearing Davis' story, the employer informed Davis that he would not be fired. Nevertheless, Davis brought suit in federal district court claiming that he had been improperly stigmatized by Government action without due process of law.

The Supreme Court noted that Davis' complaint appeared to state a classic case of defamation. The Court held, however, that Davis had not been deprived of a liberty interest protected by the Fourteenth Amendment and actionable under 42 U.S.C. § 1983. As stated by the Supreme Court, "while we have in a number of our prior cases pointed out the frequently drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, *apart from some more tangible interests such as employment*, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." 424 U.S. at 701, 96 S.Ct. at 1160 (emphasis supplied). The Court observed that any other construction of the Fourteenth Amendment "would seem almost necessarily to result in every legally cognizable injury which may have been inflicted by a state official acting under 'color of law' establishing a violation of the Fourteenth Amendment." *Id.* at 699, 96 S.Ct. at 1159.[23]

We think that the cases *distinguished* by the Court in *Paul v. Davis* are much more applicable to the present case. For instance, the Court cited *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), where the Supreme Court held that an Act of Congress which prohibited payment of any salary to three Government employees was an unconstitutional bill of attainder. The Court in *Davis* highlighted

the statement in *Lovett* that "what is involved here is a congressional proscription of [these employees], prohibiting their ever holding a government job." 328 U.S. at 314, 66 S.Ct. at 1078; *see* 424 U.S. at 702, 96 S.Ct. at 1161. Similarly, the Court in *Davis* carefully reviewed the multiple opinions of the Justices in *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), and concluded that "at least six of the eight Justices who participated in that case viewed any 'stigma' imposed by official action of the Attorney General of the United States, *divorced from its effect on the legal status of an organization or a person, such as loss of tax exemption or loss of government employment*, as an insufficient basis for invoking the Due Process Clause of the Fifth Amendment." 424 U.S. at 704–705, 96 S.Ct. at 1162 (emphasis supplied). Finally, the Court in *Davis* considered the case of *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), where the Supreme Court held that the discharge of an employee of a Government contractor did not violate due process. The Court in *Davis* noted the passage of the opinion in *McElroy* where the Court stated: "Finally, it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, *with an attendant foreclosure from other employment opportunity*." 367 U.S. at 898, 81 S.Ct. at 1750; *see* 424 U.S. at 705, 96 S.Ct. 1155, 1163 (emphasis supplied in *Davis*). The Supreme Court in *Davis* summarized these cases by stating that:

[t]he Court has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process *absent an accompanying loss of government employment.*

23. For instance, every defamation by a state official acting under "color of law" would be actionable under federal law. Similarly, "since it is surely far more clear from the language of the Fourteenth Amendment that 'life' is protected against state deprivation than it is that reputation is protected against state injury, it would be difficult to see why the survivors of an innocent bystander mistakenly shot by a policeman or negligently killed by a sheriff driving a government vehicle, would not have claims equally cognizable under § 1983." 424 U.S. at 698, 96 S.Ct. at 1159. Thus it is clear that what most influenced the Court in *Davis* was the fear of creating a comprehensive body of federal tort law based on the actions of state officials.

424 U.S. at 706, 96 S.Ct. at 1163 (emphasis supplied).

The point need not be repeated further. Contrary to the position of the Government here, it is clear that the opinion in *Paul v. Davis* supports the claim of ODDPI in this case. For, as amply detailed earlier, it is precisely the "accompanying loss of government employment" and the "foreclosure from other employment opportunity" which is the injury resulting from the Government defamation complained of in this case. As a result, we hold that a liberty interest recognized by the Fifth Amendment is implicated in this case.[24]

## C. *Sufficiency of Process Made Available to Old Dominion*

Finally, the Government contends that, even if Old Dominion possessed a due process liberty right in this situation, the procedures afforded to ODDPI were sufficient to satisfy the requirements of due process. It is not disputed that Old Dominion received absolutely no notice of the charges against it before the determination was made that it lacked responsibility (due to a lack of integrity) and that contracts were denied on that basis. It is also undisputed that a number of conversations were conducted between the Government and Old Dominion between the time the determination was made and the contracts lost. The Government contends, however, that the suspension proceedings initiated *after* the series of events in question provided Old Dominion with ample due process protection.

In support of this position, the Government points to *Horne Brothers, Inc. v. Laird*, 463 F.2d 1268 (D.C. Cir. 1972). In

that case, this court held that before the Government may suspend a Government contractor from all bidding, "fundamental fairness" requires that the bidder be given specific notice of the charges against him and, in the usual case, an opportunity to respond to those charges. 463 F.2d at 1271. The court added, however, that "we may accept a temporary suspension for a short period, not to exceed one month, without any provision for according such opportunity to the contractor." *Id.* at 1270. Similarly, in *Gonzalez v. Freeman*, 334 F.2d 570 (D.C. Cir. 1964), this court noted that "conceivably a summary debarment, in the nature of a temporary suspension, might be warranted for a reasonable period pending investigation;" otherwise "considerations of basic fairness require administrative regulations establishing standards for debarment and procedures which will include notice of specific charges, opportunity to present evidence and to cross-examine adverse witnesses, all culminating in administrative findings and conclusions based upon the record so made." 334 F.2d at 578–579.

It is plain that *Horne Brothers* and *Gonzalez* do not validate the Government conduct in this case. First of all, both of those cases dealt with *formal* Government action, and allowed a short period of delay for the imposition of procedures *otherwise required*. In *Horne Brothers*, the contractor had been formally suspended; in *Gonzalez*, the contractor had been formally debarred. In the present case no comparable decisive Government action was taken, although contracts were denied. *Such denials could have continued indefinitely with absolutely no recourse for the contractor.* In such a case, the Government cannot invoke suspen-

---

**24.** Although the Government has never attempted to suggest otherwise, we note that there is no problem of a lack of publication of the damaging characterization as was present in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). In the present case, the determination that Old Dominion lacked integrity had already been communicated through Government channels and would undoubtedly have been recommunicated every time ODDPI bid on a subsequent contract. On this point, it is appropriate to note a statement by the Seventh Circuit in a similar case: "The Commis-

sion points out that its findings will not be made public and are made available to the various agencies only on a need to know basis. However, the federal government is composed of many different agencies and departments, all of which could obtain the information under various circumstances. In effect, Larry has been stigmatized throughout the entire federal government. He is deprived of the opportunity to work in any capacity for any branch of the government." *Larry v. Lawler*, 605 F.2d 954, 958 (7th Cir. 1978).

sion procedures after-the-fact and claim that those procedures are adequate. The injury complained of in this case is the loss of contracts before Old Dominion was ever suspended, *not* the loss of contracts after suspension but before suspension procedures were able to be implemented.

█ In addition, it is clear that in the present case subsequent procedures were inadequate to satisfy the requirements of due process. The suspension regulations do not provide for specific notice of the charges against the contractor.[25] A hearing may or may not occur.[26] In the present case, the record contains no information concerning the notice ultimately given to Old Dominion. It is clear, however, that a hearing has never been given, despite the fact that over one year has passed since Old Dominion was formally suspended. Addenda to appellant's brief, item 4.[27] The suspension proceedings, whether adequate or not in their own right, clearly provided no relief for the deprivations in this case.

We need not consider whether due process is satisfied in the situation where it is impossible for some reason for the Government to give notice to the contractor *before* adverse action is taken on a determination that the contractor lacks integrity, and subsequent notice with an opportunity to respond is in fact promptly given to the contractor. That is clearly not this case. Accordingly, we hold that subsequent procedures did not satisfy the requirements of

due process in this case, and that a liberty right of Old Dominion was therefore violated.[28]

## IV.

█ We turn finally to the question of what process is due. It is by now axiomatic that a determination that a due process liberty or property right has been violated does not determine the amount or type of process that is constitutionally required. As stated in *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), "it has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands." More precisely, to identify the specific dictates of due process, three distinct factors must be considered: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

It is not necessary to repeat again the importance of the interest at stake in this

---

**25.** Defense Acquisition Regulations 1–605.3 (32 C.F.R. 1–605.3) provides that notice of suspension shall state that "the suspension is based on adequate evidence that the firm or individual has committed irregularities of a serious nature in business dealings with the Government, or that the suspension is based on irregularities which seriously reflect on the propriety of further dealings of the firm or individual with the Government, together with a description of the nature of those irregularities, in general terms, without disclosing the Government's evidence."

**26.** *See* note 10, *supra.*

**27.** It appears that the District Court was very likely misled into believing that a hearing would be granted to appellant in this case. As stated at page 5 of Judge Gesell's Memorandum Opinion, "the military has now initiated proceedings under its suspension regulations,

which proceedings will provide plaintiff with an 'opportunity to clear [its] name,' *see* DAR § 1–605.2(a)(1) & (2); *Arnett v. Kennedy,* 416 U.S. 134, 156–58, 171 n. 6, 94 S.Ct. 1633, 1645–46, 1652, n. 6, 40 L.Ed.2d 15 (1974)." 471 F.Supp. at 303.

**28.** The Government also suggested for the first time in oral argument that ODDPI could have received relief in administrative proceedings before the Government Accounting Office (GAO). The Government has never previously raised this as an option; there is absolutely nothing in the record describing such proceedings and affording us an opportunity to determine whether they are adequate. As such, we express no opinion as to the sufficiency of any proceedings available before GAO.

case. As previously recognized by this court in *Horne Brothers, supra,* and *Gonzalez, supra,* the very economic life of the contractor may be in jeopardy. *See* 463 F.2d at 1271; 334 F.2d at 574. The likely extensive and adverse effect of the Government action in this case on Old Dominion has been documented throughout this opinion.

At the same time, however, this court recognizes the need of agencies to be free to conduct Government business effectively and efficiently; we also recognize the potentially crippling effect that might result from the imposition of stringent due process requirements with respect to all agency actions adverse to unsuccessful bidders on Government contracts. If every governmental decision required a full blown hearing involving all parties affected, the conduct of Government business would be greatly impaired.

Perhaps recognizing the potentially overwhelming burden that would be placed upon the Government if stringent due process requirements were imposed in this case, appellant has never requested or claimed the right to a formal hearing. In its reply brief, Old Dominion merely asserts the right "to be notified of the allegations against its integrity, to present immediately in whatever time was available, facts and arguments to persuade the Contracting Officer that the allegations were without merit, and thereby have the opportunity to preserve the awards which, absent the allegations, would have been made to it." Appellant's reply brief, p. 7.

We agree with appellant that due process in this case includes the right to be *notified* of the specific charges concerning the contractor's alleged lack of integrity, so as to afford the contractor the opportunity to respond to and attempt to persuade the contracting officer, in whatever time is available, that the allegations are without merit. This requirement to give notice will impose absolutely no burden on the Government. Since a determination that a contractor lacks integrity may not be made without reference to specific charges or allegations, it will impose no burden on the Government to notify the contractor of those charges. In so doing, the contractor will at least have the *opportunity* to explain its actions before adverse action is taken. In this way, a simple misunderstanding or mistake may be clarified before significant injury is done to *both* the Government and the contractor.[29]

We do not suggest that the Government was required to afford the contractor any type of a formal hearing.[30] Government scheduling need not be delayed while the contractor puts on evidence. We simply hold that when a determination is made that a contractor lacks integrity and the Government has not acted to invoke formal suspension or disbarment procedures, notice of the charges must be given to the contractor as soon as possible so that the contractor may utilize whatever opportunities are available to present its side of the story before adverse action is taken. This minimal requirement will not burden the Government and, indeed, is in the interest of both parties.[31]

---

29. It must be remembered that in the present case, the Government lost at least $1,375,000 on the Okinawa contract, and $111,000 on the Yokohama contract, as a result of the rejection of Old Dominion's bids.

30. Nor do we mean to suggest that some form of hearing may not be required upon actual *or de facto* suspension. These issues are not present in this case, and we do not address them. *See* note 17, *supra.*

31. The Government repeatedly emphasizes that the procurement regulations impose upon the contractor the burden of affirmatively demonstrating its responsibility. DAR 1–902 (32

C.F.R. 1-902). As appellant points out, however, there was never any indication in this case that ODDPI's integrity was in issue. Old Dominion had performed milk contracts for more than 10 years with no contests as to its integrity (Tr. 135–136). Old Dominion had been regularly *solicited to bid and invited to negotiate* on Government contracts, negotiations which, according to the regulations, are only to be conducted with "responsible" bidders. DAR 3–805.1. We hold that in such a case due process does not relieve the Government of its duty of informing the contractor that its integrity is in question.

The present case amply illustrates the insignificant burden such notice will place on the Government, as well as the potential value it may have to the parties. On March 21, a determination was made that Old Dominion lacked integrity. On that same day, that determination and accompanying reasons were wired to the contracting officer on Yokohama. There is no reason why that same report could not have been wired to Old Dominion; the effort required to do so would have been minimal. During the period between March 21 and March 26, numerous conversations were conducted between the Government and ODDPI. During those conversations, Old Dominion could have presented its side of the story and perhaps reestablished its good name and integrity.

 We therefore hold that Old Dominion had a right to receive notice of the charges against its integrity before the Government denied ODDPI multiple contracts on that basis. Since Old Dominion did not receive that notice and an opportunity to respond, it is entitled to relief.

### V.

In a case such as the present one, it is difficult several months after the occurrence giving rise to litigation to fashion relief. Often past events cannot be reconstructed and, as a result, the injury complained of cannot be adequately corrected. Unfortunately, in this case, the injury was easier to avoid than it is to correct.

There is nothing in the record to guarantee that Old Dominion would have received the Okinawa and Yokohama contracts had it received the notice to which it was entitled. There are accordingly no grounds at this point to vacate the awards of those contracts to other contractors and grant them to ODDPI, as Old Dominion requests. However, Old Dominion did have a right to receive notice of the allegations against it, so as to have an opportunity to answer those allegations before adverse action was taken. Although the Okinawa and Yokohama contracts are no longer in issue, appellant retains the right to receive that opportunity. Whether due process has ever been granted to Old Dominion is unclear.

As discussed above, the suspension proceedings that were belatedly implemented against Old Dominion were insufficient to extinguish ODDPI's constitutional rights. Nevertheless, those proceedings may by now have afforded Old Dominion the only remedy to which it is entitled at this late date. However, we are unable to reach any conclusion on this point because we are unaware of the events that have transpired since the time when the decision was rendered by the District Court. Given these circumstances, we reverse the decision of the District Court, and remand this case to that court with instructions to determine whether the suspension proceedings, or any other proceedings, have served to cure the constitutional defect and have given appellant an opportunity to clear its name and reestablish its integrity. If such cure has not yet occurred, we instruct the District Court to reconsider the case in light of this opinion and to devise an appropriate remedy.

Reversed and remanded for further proceedings consistent with this opinion.

*So ordered.*