Bertha MORRISON, etc., Plaintiff,

v.

WASHINGTON COUNTY, ALABAMA, et al., Defendants.

Civ. A. No. 79–0632–H.

United States District Court, S. D. Alabama, S. D.

Sept. 3, 1981.

Larry T. Menefee & J. U. Blacksher, Mobile, Ala. and Jack Drake, University, Ala., for plaintiff.

Walter M. Cook and Mack B. Binion, Mobile, Ala., for Washington County Hospital Ass'n, Inc.

Peter V. Sintz and Robert C. Campbell, III, Mobile, Ala., for Washington County, Turner, Sullivan, Carpenter, Deas, Armstrong and Wheat.

James J. Duffy, Jr. and Carroll H. Sullivan, Mobile, Ala., for Dr. Paul Petcher.

## ORDER

HAND, Chief Judge.

On July 13, 1981 the trial of this case to a jury commenced. Only two defendants remained in the case. The two were Dr. Paul Petcher and Sheriff William Wheat. The claim against Dr. Paul Petcher was a state-law claim for wrongful death. The claims against Sheriff William Wheat arose under 42 U.S.C. § 1983 and Alabama's Wrongful Death statute.

By the second day of the trial, July 14, 1981, the plaintiff had called her expert witness to testify to the quality of the treatment received by the decedent from Dr. Paul Petcher. The Court ruled that the expert, Dr. David H. Knott, lacked sufficient basis upon which to express an expert opinion. Dr. Knott testified that he was unfamiliar with the quality of care rendered by a general family practitioner in the same general neighborhood in and around Chatom, Alabama. Under Alabama law this rendered Dr. Knott's testimony inadmissible. Without expert testimony from a physician the plaintiff would, as a matter of law, be unable to prove any negligence against Dr. Petcher.

After ruling that Dr. Knott would be unable to express an opinion the plaintiff huddled with her attorneys and proposed, for tactical reasons, several alternatives to the Court. First, the plaintiff proposed to rest her case against Dr. Petcher. Second, the plaintiff agreed to submit the case against Sheriff Wheat to the Court for decision by the Court as though the case had been tried to the bench from the start rather than to a jury.

Both proposals were agreeable to the Court. In light of the decision by the plaintiff to rest as to Dr. Petcher the Court directed a verdict in favor of Dr. Petcher. The findings of fact and conclusions of law which the Court enters today address only the claims against Sheriff Wheat under 42 U.S.C. § 1983 and Alabama's Wrongful Death statute.

### I. Findings of Fact

After the parties appeared in open court, after hearing the testimony of Mr. Hiller Dickerson, Dr. Paul Petcher, Dr. William Knott, and after reviewing the depositions of the defendant Sheriff William Wheat, Dr. Terrance Collins and Jesse Touchstone, the Court finds the facts to be as follows:

The decedent, Sylvester Morrison, Jr., was a thirty-nine-year-old black male who resided in Citronelle, Alabama.

Sylvester Morrison, Jr. presented himself to the Washington County Hospital in Chatom, Alabama on November 7, 1978 at approximately 1:00 p. m. at which time he was admitted to the hospital by Dr. H. C. Patterson of the Chatom Clinic.

The defendant, Sheriff William Wheat, was at all times material to this action, the Sheriff of Washington County, Alabama and the Washington County Commission provides some public funds for the operation of the Sheriff's Department on an annual basis.

Dr. Paul Petcher and Dr. Patterson were at all times material to this action admitted to the medical staff of the Washington County Hospital, (hereinafter called Hospital) and Dr. Patterson was the admitting physician for Sylvester Morrison, Jr. on November 7, 1978.

Ricky Bickerstaff was at all times material to this action employed by the City of Chatom, Alabama as a City Police Officer and that Mike Barnett was at all times material to this action employed by the State of Alabama as an Alabama State Trooper.

Sylvester Morrison, Jr. had been a long-standing patient of several years at the Chatom Clinic, which is composed of Dr. Paul Petcher, Dr. H. C. Patterson and Dr. J. L. Hubbard, Jr. Throughout the course of Sylvester Morrison's treatment by the Chatom Clinic, there had been a suggestion of alcoholism.

In the early afternoon of November 7, 1978, Sylvester Morrison was admitted to the Hospital by Dr. H. C. Patterson with a diagnosis of acute gastro enteritis and diabetes mellitus.

By the morning of November 8, 1978, Morrison began to manifest symptoms of alcohol withdrawal. He was treated by Dr. Paul Petcher with appropriate medications for alcohol withdrawal.

Dr. Petcher instructed the staff at the Hospital to call the family of Morrison at approximately 8:00 a. m. and again at 3:00 p. m. on November 8, 1978 for the purpose of obtaining assistance in treating him.

Dr. Petcher found Mr. Morrison in the lobby of the hospital at about 8:00 a. m. on November 8, 1978 trying to leave the hospital. After talking with Morrison, Dr. Petcher was able to get him to return to his room.

During the day of November 8, 1978, Morrison became increasingly restless, agitated and confused on an intermittent basis. It became necessary during the day to move Sylvester Morrison into a hospital room in which the door could be locked. On one occasion while in the locked room, Morrison threw a chair in the direction of nurses who were standing behind the locked door.

By 6:00 p. m. on the evening of November 8, 1978, various family members of Morrison had arrived at the Hospital and met with Dr. Petcher. Dr. Petcher sought to enlist their aid by getting one family member to sit in the hospital room with Morrison throughout the remainder of the evening. Dr. Petcher explained to the family that in his judgment this was necessary in order to control Morrison until a commitment hearing could be had the following morning to admit him to Searcy Hospital, a State institution in Mt. Vernon, Alabama, with an alcohol detoxification unit. The family members present refused to stay with Morrison.

As a second alternative, Dr. Petcher asked the family members to take Morrison home with them where they could take care of him and return him to Chatom the following morning for a commitment hearing. The family members again refused.

It is not altogether clear who suggested using the Washington County Jail as the facility in which to house Sylvester Morrison overnight until the commitment hearing the following morning. One member of the family did request that the Citronelle City Jail be used as opposed to the Washington County Jail since Morrison was known to the people of the City of Citronelle. This was not a satisfactory alternative to Dr. Petcher as the Citronelle Jail was too far away from him and his office in the event he were needed to render further medical treatment to Morrison.

Dr. Petcher contemplated having a commitment hearing to get Morrison admitted to Searcy Hospital, at the earliest possible time on November 9, 1978. Dr. Petcher determined during the evening of November 8, 1978 that he could not get Sylvester Morrison admitted to Searcy Hospital that evening and that a commitment hearing was a necessary prerequisite.

Dr. Petcher was seeking satisfactory alternatives and a place to house Sylvester Morrison until the commitment hearing

could be held early on the morning of November 9, 1978. Dr. Petcher determined that without family assistance, he could not safely house Morrison at the Hospital until the commitment hearing could be held.

Dr. Petcher also concluded and determined that it was not practical to put Morrison into the University of South Alabama Medical Center or the Providence Hospital in Mobile, Alabama on the evening of November 8, 1978.

By this time, 6:00 p. m. on November 8, 1978, Morrison was suffering from delirium tremens and that his other medical problems such as his diabetes were under satisfactory control and management at that time. Dr. Petcher then made the decision to discharge Morrison from the Hospital.

After this decision was made, Dr. Petcher prescribed 100 m. g. of Visaril, which is double the usual dosage given, and instructed the Hospital staff to call the Washington County Jail. It was Dr. Petcher's expectation that this medication in conjunction with the medications Morrison had been receiving during the day of November 8, 1978 would last Morrison 10 to 12 hours. The last injection of the 100 m. g. of Visaril was given at 8:00 p. m. on November 8, 1978. He did not think Morrison would need any further medication or treatment before the next morning.

Someone from the Hospital called the Washington County Jail and spoke with the jailer, Jesse Touchstone, (hereinafter called Touchstone) and requested that an officer be sent to the Hospital. The Hospital is located within the city limits and police jurisdiction of the Town of Chatom, Alabama.

Touchstone radioed Ricky Bickerstaff, (hereinafter called Bickerstaff), a City of Chatom Police Officer to respond to the call because the Hospital is in the city police jurisdiction.

The caller did not inform Touchstone that a hospital patient was to be picked up or that there was to be a commitment hearing the following morning of November 9, 1978.

The City of Chatom Police Officer, Bickerstaff, arrived at the Hospital with an Alabama State Trooper, Mike Barnett. Dr. Petcher met Officer Bickerstaff and instructed him to take Sylvester Morrison to the Washington County Jail with the directions that Morrison should be looked in on at least every hour. The information and direction was never imparted to Jailer Touchstone or to Sheriff William Wheat.

While at the Hospital, Officer Bickerstaff called Sheriff William Wheat at his home. During this conversation, he did not inform Sheriff Wheat that Morrison was a patient at the hospital. He informed Sheriff Wheat that there was a drunk at the hospital that Dr. Petcher wanted to keep in jail until a commitment hearing could be held the next morning. The Sheriff replied that it was all right with him if it was all right with Dr. Petcher. Sheriff Wheat was not informed of the identity of Morrison nor that he was a patient at the Hospital in the throes of delirium tremums. In addition, Sheriff Wheat did not go to the Washington County Jail that night.

During his conversation with Sheriff Wheat, Officer Bickerstaff did not express any reservations about placing Morrison in jail. Based on the conversation with Officer Bickerstaff, Sheriff Wheat assumed that Sylvester Morrison had just shown up at the Hospital since he was drunk at that time.

There is only one jail or detention facility in Washington County, Alabama. The City of Chatom, under an arrangement with the county, also uses it to house their prisoners. Pursuant to this agreement, Officer Bickerstaff transported Morrison to the Washington County Jail.

When they arrived at the Washington County Jail, Officer Bickerstaff charged Morrison with public drunkenness. The Court finds that Mr. Morrison was then a prisoner of the City of Chatom.

The defendant Sheriff William Wheat will not allow anyone to be held in his jail without either a charge or a court order authorizing the detention.

Jailer Touchstone had never seen or heard of Sylvester Morrison until he arrived at the jail. Mr. Morrison appeared to Touchstone to be drunk and he looked and acted like a drunk to Touchstone. Touchstone then placed Morrison in a one-man cell.

Touchstone does not have anything to do with the docketing or charging of prisoners with either city or state offenses. The arresting officer makes the appropriate charge.

No instructions, medications or directions concerning Morrison were given to Touchstone or to Sheriff William Wheat by anyone. While in the one-man cell, Morrison became loud and disruptive several times during the course of the evening. Jailer Touchstone went to the cell and talked with Morrison during the course of the evening in an attempt to calm and quiet him. The last time he spoke with Morrison was approximately 4:00 a. m. on November 9, 1978.

After talking with Morrison, Morrison quieted down and sat down on the edge of the shower. At that time he appeared to be quiet and remained quiet the rest of the night.

Morrison was subsequently found dead in the shower at approximately 5:30 to 5:45 a. m. by Touchstone.

The Court finds that the cause of death was acute cardiac arrest. That an acute cardiac arrest is completely unpredictable and untreatable within three minutes after it has occurred. That the cause of death i. e. acute cardiac arrest, did not have any relationship to the alcohol withdrawal or delirium tremens of Sylvester Morrison. Dr. Petcher could not and did not anticipate the occurrence of an acute cardiac arrest.

The Court finds that there was no way Jailer Touchstone could have known of or anticipated the occurrence of the acute cardiac arrest, it could have happened anywhere at any time. The Court finds that nothing was done that should not have been done or not done that should have been done by either the defendant Sheriff William Wheat or Jailer Touchstone that in any way caused or contributed to the acute cardiac arrest which resulted in the death of Sylvester Morrison.

## II. Conclusions of Law

This Court has jurisdiction over this controversy under both its original jurisdiction, 28 U.S.C. §§ 1331, 1343, and its pendent jurisdiction.

The plaintiff alleges several violations of the constitutional rights of Sylvester Morrison during his incarceration in the Washington County Jail pending a commitment hearing to Searcy Hospital. The crux of the plaintiff's complaint is that Morrison's constitutional freedoms under the fourth and fourteenth amendments were abridged and that Sheriff William Wheat if responsible under state law for the wrongful death of Morrison.

### A. The Fourth Amendment

■ At the time the police took custody of Morrison at the Hospital he was under arrest. An arrest was effectuated because he was not free to go as he pleased. The police were free to arrest Morrison in one of two situations: 1) upon the issuance of an arrest warrant or 2) if a warrantless arrest was authorized under Ala. Code § 15–10–3 (1975).[1]

---

1. Alabama law allows a warrantless arrest by a duly authorized police officer under the following circumstances:

    § 15–10–3. Arrest without warrant—When and for what allowed.
    An officer may arrest any person without a warrant, on any day and at any time, for:
    (1) Any public offense committed or a breach of the peace threatened in his presence;

    (2) When a felony has been committed, though not in his presence, by the person arrested;
    (3) When a felony has been committed and he has reasonable cause to believe that the person arrested committed it;
    (4) When he has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed; or

■ Initially it should be noted that the plaintiff never proved whether Morrison was taken into custody under the authority of an arrest warrant. One might assume that the record is clear on this point, but that assumption is unfounded. After examining the record in this case the Court is left to speculate whether, in fact, Morrison was taken into custody pursuant to a regularly-issued arrest warrant. Nothing appears in the record on this point either one way or the other. The burden of proof on this point is upon the plaintiff, since it is she who seeks to prove that Morrison was denied his fourth amendment right under the Constitution. Before the Court can determine whether a regularly-issued arrest warrant was used to arrest Morrison the plaintiff would have had to have offered evidence showing the absence of an arrest warrant. A court may not speculate any more than may a jury in reaching a verdict. For this reason alone the plaintiff's claim under the fourth amendment must fail.

■ But even assuming that the record adequately established the absence of a regularly-issued arrest warrant, under the facts of this case Sheriff Wheat was entitled to authorize the incarceration of Morrison, as he surely did when he told Officer Bickerstaff "to go ahead" and incarcerate Morrison in the Washington County Jail. Wheat Deposition at 10. Bickerstaff told Wheat that Morrison was intoxicated in public. Bickerstaff charged Morrison with public drunkenness when he reached the county jail. *Id.* at 15; Plaintiff's Exhibit 5. Section 15–10–3 authorizes the arrest of a person without an arrest warrant if that person commits a public offense in the presence of the arresting officer. Bickerstaff arrested Morrison, and given that arrest, the Sheriff was justified in authorizing Morrison's incarceration. *Cf. Cade v. State,* 375 So.2d 802, 826 (Ala.Cr.App.1978), *aff'd without opinion,* 375 So.2d 828 (Ala.1979). The Court holds that no violation of the fourth amendment occurred.

(5) On a charge made, upon reasonable cause, that the person arrested has committed a felony.
Ala. Code § 15–10–3 (1975).

## B. The Fourteenth Amendment

■ The due process clause of the fourteenth amendment and not the cruel and unusual punishment clause of the eighth amendment sets the standard by which this Court must judge the medical care which Morrison received while he was incarcerated in the Washington County Jail.[2]

Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment. The Court recognized this distinction in *Ingraham v. Wright,* 430 U.S. 651, 671–672, n.40, 97 S.Ct. 1401 [1412–1413, n.40], 51 L.Ed.2d 711, 97 S.Ct. 1401 (1977):

"Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. *See United States v. Lovett,* 328 U.S. 303, 317–318 [66 S.Ct. 1073, 1079–1080, 90 L.Ed. 1252] (1946) ... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."

*Bell v. Wolfish,* 441 U.S. 520, 535 n.16, 99 S.Ct. 1861, 1872 n.16, 60 L.Ed.2d 447 (1979). "The standard by which to measure the medical attention that must be afforded pretrial detainees has never been spelled out. The *Bell v. Wolfish* criterion, applied to medical attention, entitled pretrial detainees to reasonable medical care unless the failure to supply it is reasonably related to a legitimate government objective."

2. Originally when the Court addressed this issue in its order dated October 7, 1980 the Court missed the distinction between pretrial detainees and convicted prisoners.

*Jones v. Diamond*, 636 F.2d 1364, 1378 (5th Cir. 1981) (en banc).

■ In this case the medical care which Morrison received was reasonable. Morrison's attending physician, Dr. Paul Petcher, discharged Morrison from the Hospital at approximately 8:00 p. m. on November 8, 1978. At the time of the discharge Morrison was heavily sedated with Visaril. Dr. Petcher testified that ordinarily no further medication or treatment would be necessary prior to the morning of November 9, 1978, when Morrison was scheduled to appear in state court for commitment proceedings to the state mental health hospital. Thus, it was the expert opinion of Dr. Petcher that Morrison had the medical care which he should receive during the evening of November 8th through the early morning of November 9th. Nothing changes this fact, regardless of what Jailer Touchstone did or failed to do and regardless of what Touchstone knew or did not know about Morrison's prior treatment and present medical condition. Morrison received reasonable medical care; there was no failure on the part of Sheriff Wheat to provide reasonable medical care.

■ The absence of a highly trained medical technician or a physician at the Washington County Jail does not render the medical care per se unreasonable. A small, rural jail, with no prior history of medical emergencies, is not constitutionally required to maintain a medical technician or a physician on the premises. In fact, Dr. Petcher testified that he was on-call at the county jail and available to treat any medical emergencies. This was the standard operating procedure.

■ As in all aspects of life the United States Constitution sets the minimal standards which government owes its citizens when it protrudes into constitutionally protected areas. The due process clause requires that pretrial detainees receive reasonable medical care. Undoubtedly, Morrison might have received better medical care than that which he received. However, this case does not turn upon whether Morrison might have received better medical care or whether he received the best medical care. The care which he received was reasonable. The Constitution requires nothing more of Sheriff Wheat. Therefore, the Court holds that the plaintiff has failed to prove any violation of Morrison's fourteenth amendment rights.

## C. Immunity

■ Had liability under § 1983 been established for a violation of Morrison's fourth amendment or fourteenth amendment rights the Sheriff would be protected from liability in his individual capacity because of his qualified, good-faith immunity. *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975); *Familias Unidas v. Briscoe*, 619 F.2d 391, 403 (5th Cir. 1980). As to the fourth amendment claim the Sheriff recognized that a person could only be confined in the Washington County Jail if he had either 1) been charged with an offense or 2) been arrested pursuant to the terms of regularly issued judicial process. Wheat Deposition at 15–16. Thus the authorization which the Sheriff extended to Bickerstaff to incarcerate Morrison was made with a careful eye toward constitutional limitations.

Under the fourteenth amendment claim, if one had been made out, the Sheriff would be shielded from liability in his individual capacity. At the time Morrison tragically died in the Washington County Jail the Supreme Court had yet to decide *Bell v. Wolfish*. That case was decided May 14, 1979; Morrison died November 9, 1978. It goes without saying that a sheriff from a rural community is not charged with forecasting the development of constitutional doctrine.

Had the Sheriff been judged by the deliberate indifference standard of *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), which would have appeared to be the prevailing standard in November, 1978, no liability would attach to Sheriff Wheat. The record is clear that Wheat knew nothing about the details of the medical treatment which Morrison re-

ceived while in the jail. Without some personal knowledge of the medical care which Morrison received, the Sheriff could not have acted with the intent required by *Estelle v. Gamble*, i. e. deliberate indifference to the serious medical needs of Morrison.

Moreover, nothing in this case suggests that Wheat set out with the malicious intention to deprive Morrison of his constitutional rights. Had liability under § 1983 been established, Wheat would enjoy immunity for damages in his individual capacity.

D. Wrongful Death

In addition to the claims under § 1983 the plaintiff seeks recovery of punitive damages under Alabama's Wrongful Death Statute. Ala.Code § 6–5–410 (1975). Section 6–5–410 provides a cause of action to the personal representative of the decedent against any person or corporation where the wrongful act, omission, or negligence of the person or corporation caused the death of the decedent. A person or corporation can also be bound by an agent.

Undoubtedly the Sheriff, or his jailer acting within the scope of his employment, had a duty to exercise reasonable care to see to it that pretrial detainees and prisoners alike were afforded reasonable medical care. Reasonable medical care is that degree of care which a reasonable person under like circumstances as Sheriff Wheat would have made available. In this case, Morrison was discharged directly from the Hospital to the jail. Dr. Petcher testified that Morrison was adequately sedated and that, in his opinion, no additional treatment or medication would be required by Morrison at least through the night. While neither Sheriff Wheat or Jailer Touchstone were aware of this, the fact remains that a doctor had been supervising Morrison up to the time he was discharged to the jail and it was the opinion of the doctor that Morrison would need no additional medication or treatment. The duty to exercise reasonable care which the Sheriff owed a pretrial detainee such as Morrison was satisfied. The Sheriff could have done no more had it been his policy to have each prisoner examined by a physician upon being admitted to the jail. Morrison was examined and treated by a physician shortly before being placed in the one-man cell at the Washington County Jail. For purposes of this analysis it is quite irrelevant that the examination took place a few miles from the jail and a few minutes before Morrison actually crossed the threshold of the jailhouse door. The Court holds that the duty of care which Sheriff Wheat owed to provide adequate medical supervision at the jail was not breached.

Likewise, it cannot be said that the duty which the Sheriff owed to properly supervise pretrial detainees in a reasonable manner was breached. The testimony is that Jailer Touchstone repeatedly checked on Morrison as the evening progressed. Morrison was locked in a one-man cell, protected from others. While it may be said that Morrison's conduct had the potential to physically injure him, the record does not support such a finding. Morrison was no more unruly than many people who were incarcerated in the Washington County Jail. A sheriff is charged under the law with the duty to reasonably supervise his prisoners and not with the duty to absolutely insure their safety under all conceivable circumstances. The Sheriff discharged his duty.

But even if it could be said that Sheriff Wheat was vicariously liable for some failure by Jailer Touchstone to discharge the duty of care which the Sheriff owed Morrison, it cannot be said that the breach of the duty of care was the proximate result of Morrison's death. Dr. Petcher testified on the stand that, in his opinion, the cause of Morrison's death was acute cardiac failure. This opinion differed from that reached by the state forensic science laboratory which performed the autopsy on Morrison. The state forensic science laboratory determined that the cause of death was "acute alcohol abstinence syndrome." The two diagnosis, as the plaintiff recognizes in her posttrial brief, are not inconsistent.

956

Acute cardiac failure is unpredictable and unforeseeable. Even assuming that Sheriff Wheat failed to exercise reasonable care in providing medical attention or supervision to Morrison, no failure on the part of the Sheriff proximately caused the acute cardiac failure. Because the death of Morrison was caused by an acute cardiac failure even assuming that the Sheriff was negligent in some respect, that negligence would not be the proximate cause of Morrison's death. The acute cardiac failure was an unforeseeable superseding cause. A sheriff is required only to take reasonable care of the medical and supervisory needs of his charges. A sheriff does not insure the safety of those who are placed in his jail. Accordingly, the Court finds that nothing which either the Sheriff or his agent, Jailer Touchstone, did negligently cause the death of Sylvester Morrison, Jr. on November 9, 1978.

III. Order

It is hereby ordered that the claims against Sheriff Wheat be dismissed with prejudice.

Costs are taxed against the plaintiff.