782 S.W.2d 381 (1990)
STATE of Missouri, ex rel., BUNKER RESOURCE RECYCLING AND RECLAMATION, INC., Appellant,
v.
G. Tracy MEHAN, III, Director, Missouri Department of Natural Resources, and The Department of Natural Resources, State of Missouri, Respondents.
No. 71897.
Supreme Court of Missouri, En Banc.
January 10, 1990.
*383 David J. Waxse, Overland Park, Kan., John Dods, Craig Gustafson, Kansas City, Mo., for appellant.
William L. Webster, Atty. Gen., Edward F. Downey, Asst. Atty. Gen., Jefferson City, Mo., for respondents.
HOLSTEIN, Judge.
Appellant Bunker Resource Recycling and Reclamation, Inc., (Bunker) appeals from a judgment denying its petition for a writ of mandamus. The case was brought to compel the Missouri Department of Natural Resources (DNR) and its Director, G. Tracy Mehan, III, to process Bunker's application for a permit to incinerate infectious waste, or, in the alternative, to grant such permit. DNR filed a counterclaim seeking a declaratory judgment. Following a judgment by the trial court, an appeal was originally lodged in the Missouri Court of Appeals, Western District. However, the appeal was transferred to this court because the only question on appeal was the constitutionality of a statute. See Mo. Const. art. V, §§ 3, 11.
The case was presented to the circuit court on a "Stipulation of Facts For Trial." Other than procedural matters, the information recited below is extracted from the stipulation of facts.
In February of 1987 Edward J. Juracek, a director of Bunker, met with Stan Jorgensen, director of the Waste Management Program for DNR, to determine the permits necessary for Bunker to construct and operate an infectious waste incinerator in Reynolds County. Jorgensen indicated that no solid waste permit was then required to operate an infectious waste incinerator. In addition, Juracek was provided with a copy of a letter from DNR to the Superintendent of the Ozark National Scenic Riverways Park, dated April 6, 1987, stating that no solid waste permit was required to operate an infectious waste incinerator.
Bunker constructed an incinerator facility and made application for a "clean air" permit[1] on February 22, 1987. A clean air permit was issued by DNR on May 5, 1987. No other permits were sought until September 8, 1987. The clean air permit authorized emission of specified levels of contaminants based upon the anticipated incineration of 18.9 tons of infectious waste annually. The waste was to be incinerated at a temperature of 1800 degrees Fahrenheit. Based on the representations of the DNR officials and the clean air permit, Bunker commenced operation of its incinerator facility in the city of Bunker, Missouri, on June 1, 1987. At the time Bunker began operating, § 260.205.1, RSMo 1986, was in effect. It provided:
It is unlawful for any person to operate a solid waste facility or solid waste disposal area of a solid waste management system without first obtaining a permit from [DNR].
On July 1, 1987, two new statutes became effective, § 260.203.1 and § 260.378, RSMo 1986. Although the former section was modified and the latter repealed during the 1988 session of the General Assembly,[2] each provided that infectious waste must be taken to a "hazardous waste facility *384 [or] a solid waste facility permitted for treatment of infectious waste by" DNR.
Also on July 1, 1987, the director of DNR's Division of Environmental Quality notified all infectious waste handlers, including Bunker, that until DNR adopted regulations relating to infectious waste handling facilities, "existing facilities can continue to operate under the authority that they operate under now (i.e., air pollution permits, hospital license, etc.)." On July 28, the chief of the Department of Environmental Quality's hazardous waste section instructed the regional DNR office at Poplar Bluff that the incinerator facility at Bunker would be allowed to operate pending the adoption of regulations if the facility was in compliance with its air or water permit.
On that same day, July 28, 1987, an action was filed by residents of the city of Bunker seeking a declaratory judgment that the incinerator was operating in violation of Missouri law and asking for an injunction against further operation of the incinerator. In that case it was determined that because Bunker was operating its incinerator without a solid waste permit or hazardous waste permit, it was not authorized to continue operation. A permanent injunction was granted. The judgment was affirmed on appeal. Mertzlufft v. Bunker Resources Recycling and Reclamation, Inc., 760 S.W.2d 592 (Mo.App.1988). Bunker did not operate its incinerator after July 28, 1987.
On September 8, 1987, Bunker filed an application with DNR for a solid waste processing permit. On October 14, 1987, this action for mandamus was commenced to compel DNR to (1) issue a solid waste processing permit, (2) process Bunker's request for a permit by giving the required notices to the public, landowners adjoining the Bunker incinerator and the governing body of the city of Bunker, and thereafter holding all necessary hearings, and (3) promulgate rules concerning the operation and requirements for permits for solid waste processing facilities handling infectious waste. DNR did not act on relator's application for a permit through May of 1988.
On about May 6, 1988, Senate Bill No. 535 was signed into law by the Governor, having previously been enacted by the General Assembly. The new enactment included § 260.204:[3]
No person shall be issued a permit to operate a facility for the treatment of infectious waste who in 1987 received a clean air permit and thereafter operated a facility for the treatment of infectious waste by incineration without applying for and receiving a permit as a solid waste processing facility permitted pursuant to § 260.203 or a hazardous waste facility permitted pursuant to §§ 260.350 to 260.430.
According to the stipulation, the only person or entity who could be denied a permit because of the above-quoted statute is Bunker. There is no written legislative history of the law.
On June 9, 1988, respondents filed a counterclaim asking the trial court to declare § 260.204 constitutional and to declare that Bunker is disqualified from receiving a permit to incinerate solid waste because of that section.
The trial court concluded that § 260.204 was a legitimate exercise of the state's police power to regulate the handling and disposal of infectious waste. Judgment was entered denying relator's petition for writ of mandamus and in favor of DNR on its counterclaim.
The dispositive issues presented here are (1) whether § 260.204 is a special law prohibited by Mo. Const. art. III, § 40 and (2) whether § 260.204 is a prohibited bill of attainder under U.S. Const. art. I, § 10.
Art. III, § 40 of the Missouri Constitution provides:
"The general assembly shall not pass any local or special law:
(30) where a general law can be made applicable, and whether a general law could have been made applicable is a *385 judicial question to be judicially determined without regard to any legislative assertion on that subject."
A statute is invalid as a "special law" if members of a stated class are omitted from the statute's coverage whose relationship to the subject matter cannot by reason be distinguished from that of those included. State ex rel. Public Defender Comm'n v. County Court of Greene County, 667 S.W.2d 409, 412 (Mo. banc 1984). Worded differently, "[a] law may not include less than all who are similarly situated." Wilson v. City of Waynesville, 615 S.W.2d 640, 644 (Mo.App.1981) (citing State ex inf. Barrett ex rel. Bradshaw v. Hedrick, 294 Mo. 21, 241 S.W. 402, 420 (1922)). See also Ross v. Kansas City General Hospital and Medical Center, 608 S.W.2d 397, 400 (Mo. banc 1980). Even a facially special statute does not violate the constitutional prohibition if some characteristic of the excluded class provides a reasonable basis for its exclusion. State ex rel. Public Defender Comm'n v. County Court of Greene County, supra. One who assails the classification must carry the burden of showing that it is essentially arbitrary and unreasonable. Id.
DNR asserts, and we agree, that the only valid purpose of § 260.204 would be to protect public health and welfare from the dangers related to transporting and disposing of infectious wastes. However, the statute imposes its sanction only against those who received clean air permits in 1987. Others similarly situated, that is, those who performed the identical acts as relator but who either never held a clean air permit or received a clean air permit in a year other than 1987, are excluded from the statutory classification. An entity like Bunker in all respects, but for its failure to receive a clean air permit in 1987, has no special characteristic justifying its exclusion from the statutory class. Even if we ignored the clean air permit language, as DNR suggests in its brief, the statute would not apply to one who incinerated infectious waste in a year other than 1987 without any waste disposal permit. Also, the statute, as DNR would have us construe it, would not apply to unlicensed persons who in 1987 disposed of infectious waste by some method other than incineration. No discernible characteristic of infectious waste treated by incineration is different from infectious waste treated by some other method; neither is there a difference in infectious waste incinerated in 1987 distinguishing it from infectious waste incinerated in any other year. No reasonable basis exists for the differential treatment of one who disposed of infectious waste by incineration in 1987. Section 260.204 is a prohibited special law under the Missouri Constitution. However, there is an equally compelling reason for declaring the statute unconstitutional.
Art. I, § 10 of the U.S. Constitution prohibits any state from passing a bill of attainder. Missouri cases on the subject of the Bill of Attainder Clause are sparse and, so far as can be determined, no Missouri court has ever invalidated a statute because it was found to be a bill of attainder. This Court, quoting United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946), defined bills of attainder as "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." King v. Swenson, 423 S.W.2d 699, 704 (Mo. 1968).
An understanding of the prohibition against bills of attainder begins with an examination of the evils that the framers of the Constitution sought to prevent by adopting the clause. During the three centuries preceding the American Revolution, the British Parliament used the "bill of attainder" as a device to impose a sentence of death against named persons or identifiable members of a group without benefit of trial. United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1965). An almost identical legislative device known as the "Bill of Pains and Penalties" inflicted less onerous punishments such as imprisonment, banishment, and confiscation of property of specified persons or groups, also without benefit of a judicial trial. Nixon v. Administrator of *386 General Services, 433 U.S. 425, 97 S.Ct. 2777, 2806, 53 L.Ed.2d 867 (1977). During the Revolutionary War, all thirteen state legislatures adopted laws directed against those loyal to the Crown; among these statutes were a significant number of bills of attainder and bills of pains and punishment. U.S. v. Brown, 85 S.Ct. at 1711. No doubt exists that the framers of the United States Constitution were familiar with the infamous history of bills of attainder when the prohibition against such statutes by states was adopted unanimously and without debate by the Constitutional Convention.
The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simplytrial by legislature.
U.S. v. Brown, 85 S.Ct. at 1711-12.
The question remaining to be resolved by judicial interpretation was whether a statute traditionally defined as a "Bill of Pains and Penalties" was barred by the Bill of Attainder Clause. The question was answered in Cummings v. State of Missouri, 4 Wall. 277, 18 L.Ed. 356 (1866), and Ex Parte Garland, 4 Wall. 333, 18 L.Ed. 366 (1866). Each case held that within the meaning of the Constitution, bills of attainder included bills of pains and penalties. Cummings, 4 Wall. at 323; Garland, 4 Wall. at 377.
Two elements identify a legislative act as a bill of attainder. The first is that the statute singles out a "specifically designated person or group," and the second element is that the act inflicts punishment on that person or group. Selective Service System v. Minnesota Public Interest Research Group, et al, 468 U.S. 841, 104 S.Ct. 3348, 3352, 82 L.Ed.2d 632 (1984). The first element is referred to as the specificity element and the second as the punishment element.
In its brief, Bunker argues that it is the only member of a group singled out for distinctive treatment, and therefore it meets the specificity element of the test. DNR responds that there are cases holding that a statute that applies to only one person may still be valid, citing Nixon, supra.
In the Nixon case, a federal statute required that the Administrator of General Services obtain and keep control of all President Richard Nixon's conversations recorded by employees of the federal government. Nixon, 97 S.Ct. at 2785. Nixon argued that the law applicable to him alone amounted to a bill of attainder. Id. at 2803. The court pointed out that specificitythe act referred to Nixon by namedoes not automatically offend the Bill of Attainder Clause. All prior presidential papers, from Hoover to Johnson, were already housed in functioning presidential libraries. However, Nixon had entered into agreements calling for destruction of certain materials which might be useful historically, as well as in ongoing criminal prosecutions. As a result there was a reasonable, nonpunitive basis for limiting the act to Nixon's records. Id. at 2805.
Nothing in Nixon suggests that a statute imposing a sanction against easily ascertainable members of a group fails to meet the specificity element. Just because there is a nonpunitive purpose, the legitimacy of a law creating a class subject to a legislatively imposed punishment is not established. Selective Service System, 104 S.Ct. at 3355. Each case necessarily turns on its own facts. Id.
In the statute under consideration, Bunker is not referred to by name. However, it is difficult, if not impossible, to describe relator with more specificity short of uttering the corporate title. The statute applies only to those persons or entities who (1) received a clean air permit in 1987, (2) thereafter operated a facility for the treatment of infectious waste, (3) used incineration as the method for the treatment of infectious waste, and (4) did not apply for and receive a solid waste permit pursuant to § 260.203 or a hazardous waste permit *387 pursuant to §§ 260.350 to 260.430. Given the nature of the multiple conditions essential to membership in the class, the only rational conclusion is that the legislature intended the statute to affect Bunker alone.
The specificity element of the definition of "bill of attainder" is met by a statute singling out an individual, whether the individual is called by name or described in terms of past conduct which, because it is past conduct, operates only as a designation of particular persons. Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 1405, 6 L.Ed.2d 625 (1961). Legislation is not held to be directed at specific persons if the class is such that the affected persons can escape regulation merely by altering the course of present activities or bringing themselves into compliance with the law. Selective Service System, 104 S.Ct. at 3358; Communist Party of the U.S., 81 S.Ct. at 1406; American Communications Assoc. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 692, 94 L.Ed.2d 925 (1950). The affected class in § 260.204 is determined entirely on past conduct and no method of escaping the class is provided. A class described by past conduct and so carefully circumscribed as that found in § 260.204 meets the specificity element of the definition of a bill of attainder.
As previously noted, legislation directed at and burdensome to only a single individual or group does not by itself violate the Bill of Attainder Clause if there is a rational, nonpunitive basis for the legislation. Nixon, supra. The question becomes whether the legislation imposes a constitutionally forbidden punishment. In making that determination, the court makes three inquiries: (1) whether the challenged statute falls within the historical meaning of legislative punishment, (2) whether the statute, viewed in a light of the severity of burdens it imposes, can reasonably be said to advance a nonpunitive legislative purpose, and (3) whether the legislative record discloses an intent to punish. Selective Service System, 104 S.Ct. at 3355.
Barring a specific person or identifiable group from participating in a lawful, albeit regulated, business or profession is historically recognized as a punishment. In Cummings v. State of Missouri, supra, the United States Supreme Court held that the provision of Missouri's 1865 Constitution prohibiting a priest from practicing his profession without taking an oath that he had not participated in the rebellion against the Union amounted to punishment. In Ex Parte Garland, supra, a federal statute prohibiting an attorney from practicing in federal courts who failed to take an oath that he did not participate in the Civil War against the Union was held to amount to punishment. In U.S. v. Lovett, supra, a statute barring named individuals from ever receiving compensation for employment with the United States Government was treated as legislatively imposed punishment. In U.S. v. Brown, supra, a statute barring members of the Communist Party from becoming officers of labor unions was said to impose a punishment within the context of the Bill of Attainder Clause. Viewed in historical perspective, a statute ineluctably barring Bunker from engaging in a lawful enterprise is punishment.
The historical development of the concept of legislative punishment does not end the inquiry. The second inquiry applies a functional approach in which the court determines if a nonpunitive legislative purpose is advanced by the law. Generally, legislation intended to prevent future danger, rather than to punish past action, is not an unconstitutional bill of attainder. King v. Swenson, supra. However, if the function of the statute does not advance the intended purpose and the statute operates only as a punishment of specific persons or a class, the act is a bill of attainder. Selective Service System, 104 S.Ct. at 3354.
Hawker v. People of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898), is an example of a situation in which a legitimate nonpunitive purpose was advanced even though the statute in question barred a class of persons from a lawful profession. A statute prohibiting convicted felons from *388 practicing medicine was held not to violate the Bill of Attainder Clause because a legitimate legislative purpose was advanced by insuring that only persons of good character practice medicine. Hawker, 18 S.Ct. at 576. However, the court in that case went on to say, "We do not mean to say that [the state] has an arbitrary power in the matter, or that it can make a conclusive test of that which has no relation to character, ...." Id.
Respondent argues that the legitimate, nonpunitive legislative purpose of § 260.204 is to protect "the health and lives of Missouri citizens and its environment from operation of infectious waste incinerators which do not fully comply with Missouri's environmental laws.... To further this goal, the legislature sought to preclude persons or entities from operating in the state when those persons or entities have blatantly violated this state's environmental laws." Unquestionably legislation may be crafted to prohibit those from obtaining permits whose conduct in the past has demonstrated that in the future they will be unlikely to conform to environmental regulations. For example, see §§ 260.395.16 and 260.241, RSMo Supp.1988.
The statute challenged here is significantly different from that in Hawker and §§ 260.395.16 and 260.241. The sanction found in § 260.204 is not directed at those who have "blatantly violated" the environmental laws. There is no conceivable relationship between receiving a clean air permit in 1987 and the likelihood that the holder of such permit will violate the law in the future. If the legislative purpose was to deny permits to those of "bad character" or those who were "blatant violators," the class described in the statute totally misses the mark. The only entity caught in the net of allegedly blatant violators is one which sought to subject itself to regulation by the state agency charged with regulating and enforcing waste disposal laws. The statute imposes its sanction only against a class of persons whose entire waste disposal operation was performed with the full knowledge and explicit approval of DNR. Excluded from the class are those whose conduct was the same as or more egregious than Bunker's, but who never sought or obtained any permits from DNR or who received a permit in a year other than 1987. The classification does not describe persons with proven records of repeatedly or intentionally evading regulation or those convicted of violating environmental laws. The nonpunitive legislative purpose asserted by DNR is not advanced by prohibiting the class of persons described in § 260.204 from obtaining a permit to operate an infectious waste disposal facility. In sum, the statutory class of which Bunker is the sole member is not reasonably related to any proper legislative purpose and serves only to punish relator.
The final inquiry is to examine the legislative record to determine if it "evinces a congressional intent to punish." Nixon, 97 S.Ct. at 2808. The parties' stipulation indicates that there is no written legislative history. Relator has attempted to amend the record by attaching to its motion for new trial a portion of a deposition and two newspaper articles identified in the deposition. The newspaper articles purport to quote legislative sponsors of § 260.204. Assertions in the motion for new trial, but not included in the stipulated record, preserve nothing for our review. Lake in the Woods Apartment v. Carson, 651 S.W.2d 556, 559 (Mo.App.1983). However, both the specificity and the punishment elements necessary to establish the statute as a bill of attainder are satisfied without reference to any legislative history.
Respondent argues here, and the trial court found, that even if the statute is unconstitutional as written, the clean air permit language may be treated as mere surplusage. DNR does not identify exactly which words we should disregard. Apparently, DNR would have us construe § 260.204 to prohibit anyone from obtaining an infectious waste permit who in 1987 operated an infectious waste incinerator without a solid waste permit or a hazardous waste permit. Respondent believes that such construction would cure the constitutional objections and would apply only to Bunker, thus preserving the effect of *389 the legislation. The argument is flawed for two reasons. First, a statute construed as singling out for legislative punishment those who in a specified year operated an infectious waste incinerator without particular permits, but excluding others similarly situated, remains a bill of attainder and special legislation under the analyses already discussed at length. Second, the possibility exists that someone unknown to DNR and Bunker operated an infectious waste incinerator in 1987 without any permits. The claim that the statutory class would not be expanded is pure speculation.
The test for upholding a statute, some portions of which are invalid, is whether, after separating that which is invalid, a law is left in all respects complete and susceptible of constitutional enforcement which the legislature would have enacted if it had known that the exscinded portions were invalid. Simpson v. Kilcher, 749 S.W.2d 386, 393 (Mo. banc 1988).
If, by striking out a void exception, proviso, or other restrictive clause, the remainder, by reason of its generality, will have a broader scope as to subject or territory, its operation is not in accord with the legislative intent, and the whole would be affected and made void by the invalidity of such part.
Preisler v. Calcaterra, 243 S.W.2d 62, 66 (Mo. banc 1951) (quoting McDaniel v. Schramm, 272 Mo. 541, 553, 199 S.W. 194, 197 (1917)). To treat any part of § 260.204 as surplusage would broaden the class to be denied permits, modify the clear legislative intent, and result in untold mischief. Thus, the statute is invalid in its entirety.
This Court is always reluctant to declare an act of the General Assembly unconstitutional. Only the clearest proof will suffice to establish the unconstitutionality of a statute because it constitutes a bill of attainder. King v. Swenson, 423 S.W.2d at 704. Similarly, special legislation must be shown to exist beyond reasonable doubt. State v. Cushman, 451 S.W.2d 17, 19 (Mo.1970). However, when a statute displays every badge normally worn by bills of attainder and special legislation, it is untenable to conclude that the statute is constitutional.
In holding § 260.204 unconstitutional, we do not say that the legislature cannot weed out those who through persistent or intentional violation of the environmental laws have demonstrated some degree of moral or legal culpability which would make them unfit or untrustworthy to operate infectious waste disposal facilities. If the General Assembly chooses to accomplish that purpose, it must do so by rules of general applicability and cannot specify the people upon whom its sanction is to be levied. U.S. v. Brown, 85 S.Ct. at 1722.
A writ of mandamus is the appropriate remedy in this case. A writ of mandamus may issue in cases where the ministerial duties sought to be coerced are simple and definite, arising under conditions admitted or proved and imposed by the law. State ex rel. Phillip v. Public School Retirement System, 262 S.W.2d 569, 573 (Mo. banc 1953); State ex rel. Patterson v. Tucker, 519 S.W.2d 22, 24 (Mo.App.1975). Section 260.205.6 provides that upon the filing of an application for a solid waste processing facility, the DNR is to perform certain acts, including giving notice and holding a hearing. These are not discretionary actions. Failure of the agency to perform ministerial acts does not result in a "contested case" which requires exhaustion of administrative remedies. See State ex rel. Keeven v. City of Hazelwood, 585 S.W.2d 557, 560 (Mo.App.1979), and § 536.150, RSMo 1986.
The judgment of the circuit court is reversed and the cause remanded to the trial court with directions to issue a writ of mandamus to DNR to perform those ministerial acts required upon the filing of the application for a solid waste processing permit as provided in Chapter 260, RSMo, and to enter judgment against DNR on its counterclaim for declaratory judgment.
All concur.
NOTES
[1] Although the Stipulation of Facts refers to such permits being provided by Chapter 640, RSMo 1986, the permit was apparently issued pursuant to the provisions of Chapter 643, RSMo 1986, relating to air conservation.
[2] RSMo Supp.1988.
[3] RSMo Supp.1988.