JERRY E. SMITH, Circuit Judge,
dissenting:
En route to minting a “regulatory exception” to the Bill of Attainder Clause, the majority holds that punishment is not punishment when it is inflicted with a “prophylactic” intent. The majority reaches this cherished goal by stitching together a patchwork of concurrences and dissents and by brushing aside binding Supreme Court majority opinions as “aberrant” and “unsensi-ble.” I respectfully dissent.
I.
The Telecommunications Act of 1996 singles out twenty named corporations for severe line-of-business restrictions characterized, in the Act’s telling language, as the “Special Provisions.” This case hinges on whether these economic restrictions, which *248 bar the named firms from lucrative telecommunications markets, amount to legislative “punishment” as historically understood.
A.
The Supreme Court has consistently held that bars to employment constitute punishment for purposes of the Bill of Attainder Clause. In one of the earliest bill of attainder eases, Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 320, 18 L.Ed. 356 (1866), the Court observed that “[disqualification from the pursuits of a lawful avocation ... may also, and often has been, imposed as punishment.” The Court struck down, as a bill of attainder, a provision in the Missouri Constitution prohibiting Confederates or their sympathizers from holding certain jobs. The Court recognized that “in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one, and that in the protection of these rights all are equal before the law. Any deprivation or suspension of any of these rights for past conduct is punishment, and can be in no otherwise defined.” Id. 71 U.S. at 321-22 (emphasis added).
The law has not changed. In Ex parte Garland, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866), the Court applied Cummings’s reasoning to strike down, as a bill of attainder, a federal statute barring Confederates from practicing in the federal courts. More' recently, in United States v. Lovett, 328 U.S. 303, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), the Court reaffirmed the principle that line-of-work restrictions are inherently punitive, invalidating a federal statute terminating the salaries of three named federal employees. And in United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), the Court once again held that a statute proscribing entry into a certain line of work constituted punishment, striking down a federal statute that forbade members of the Communist Party from serving as labor union officials.
Any doubt that employment, bars fall squarely within the historical conception of punishment was érased by the Court’s two most recent bill of attainder cases. In Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 474, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Court canvassed the various burdens historically deemed punitive, concluding that “[o]ur country’s own experience with bills of attainder resulted in the addition of another sanction to the list of impermissible legislative punishments: a legislative enactment barring designated individuals or groups from participation in specified employments or vocations....”
The Court’s latest pronouncement,’ in Selective Serv. Sys. v. Minnesota PIRG, 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), echoes Nixon: “In our own country, the list of punishments forbiddpn by the Bill of Attainder Clause has expanded to include legislative bars to participation by individuals or groups in specific employments or professions.” 468 U.S. at 852, 104 S.Ct. 3348. Indeed, employment bars “have constituted the most common sort of statutes struck down by the Court as unconstitutional bills of attainder.” BellSouth Corp. v. FCC, 144 F.3d 58, 72-73 (D.C.Cir.1998) (Sentelle, J., dissenting) (citing Selective Service, 468 U.S. at 852, 104 S.Ct. 3348).
The majority’s ancillary argument that “the Special Provisions are not punitive because they do not impose a perpetual bar” is meritless. The majority quotes Selective Service, 468 U.S. at 853, 104 S.Ct. 3348, which states that “[a]' statute that leaves open perpetually the possibility of [qualifying for some specifically denied benefit] does not fall within the historical meaning of forbidden legislative punishment” (brackets added by majority). But in Brown, the Court had already considered and rejected the majority’s escapability argument, explaining:
We do not read [two prior cases] to have set up inescapability as an absolute prerequisite to a finding of attainder. Such an absolute rule would have flown in the face of explicit precedent, Cummings v. Missouri, 4 Wall. 277, 324, 18 L.Ed. 356, as well as the historical background .of the constitutional prohibition. A number of ante-Constitution bills of attainder inflicted their deprivations upon, named or described persons or groups, but offered them the option of avoiding the depriva *249 tions, e.g., by swearing allegiance to the existing government.
381 U.S. at 457 n. 32, 85 S.Ct. 1707. This illustrates that the Bill of Attainder Clause cannot be avoided simply by inserting into the statute a means of escape. The fact that the federal government holds the key to the Baby Bells’ prison is irrelevant.
B.
Faced with the unhappy reality of well over a century of Supreme Court cases holding that employment bars constitute punishment, the majority announces the discovery of a heretofore unrecognized exception to the Bill of Attainder Clause: the “prophylactic exception.” Apparently this creature awakens only in cases such as this — when Congress punishes, but acts with a beneficent, regulatory intent.
The method through which the majority traces the evolution of the “prophylactic exception” reveals its suspect pedigree. The exception’s origin is said to lie in Justice Miller’s dissent in Garland, where he suggested that the employment bar at issue was not punitive because Congress did not intend it as such. Rather, Justice Miller argued, the statute should properly be viewed as a prophylactic measure, because Congress merely sought to protect the public from the future misdeeds of the attainted individuals. See 71 U.S. (4 Wall.) at 393-96 (Miller, J., dissenting).
This theory, rejected by the Garland majority, was purportedly adopted some decades later in Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889), and Hawker v. People of State of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898). Unlike most of the authorities the majority relies on to support the prophylactic exception, Dent and Hawker are majority opinions. But they have little to say about this case: The statute at issue in Dent did not single out individuals for punishment, but concerned a state’s generally applicable licensing requirements; similarly, the burden in Hawker was imposed on a class rather than named individuals. In any event, no subsequent case has interpreted Dent and Hawker the way the majority does here — as authorizing congressional punishment of individuals as long as the statute can be said to prevent future harms.
The cornerstone of the majority’s theory is Justice Frankfurter’s concurrence in Lovett, 328 U.S. at 318, 66 S.Ct. 1073. Although Justice Frankfurter distinguished between “harm [that is] inflicted by government authority” and “punishment,” id. at 324, 66 S.Ct. 1073 (Frankfurter, J., concurring), the majority of the Court refused to embrace this view. Cf. Seminole Tribe of Florida v. Florida, 517 U.S. 44, 66, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding that a minority opinion is “of questionable precedential value, largely because a majority of the Court expressly disagreed with the rationale of the plurality”). Rather than adopt Justice Frankfurter’s narrow reacting of the Bill of Attainder Clause, the Court majority held that the challenged law, which terminated the salaries of three named federal employees, “ ‘operates as a legislative decree of perpetual exclusion’ from a chosen vocation” and therefore “clearly accomplishes the punishment of named individuals without a judicial trial.” Lovett, 328 U.S. at 316, 66 S.Ct. 1073 (quoting Garland, 71 U.S. (4 Wall.) at 377). The majority quite plainly equated employment bars with punishment.
Finally, Brown and Nixon foreclose any suggestion that the full Court subsequently adopted Justice Frankfurter’s minority view. Brown, which the panel majority cryptically claims “did not purport fully to abandon the prior development of the punitive element,” concluded that the employment restriction at issue — barring members of the Communist Party from holding certain jobs — amounted to punishment. The Court surveyed its bill of attainder jurisprudence and, relying on Garland and Lovett, held that the statute “plainly constitutes a bill of attainder” because “it designates in no uncertain terms the persons who possess the feared characteristics and therefore cannot hold union office.... ” 381 U.S. at 449, 450, 85 S.Ct. 1707.
Nixon is even more direct. There, the Court explained that “legislative enactment[s] barring designated individuals or groups from participation in specified employments or vocations” are “impermissible” *250 and “unquestionably have been held to fall within the proscription of Art. I, § 9.” 433 U.S. at 473, 474, 97 S.Ct. 2777. This stark language leaves little room for the majority’s “prophylactic exception”: Impermissible is impermissible. Once a court determines that Congress has imposed a burden historically deemed punitive, such as the employment bar at issue here, that is the end of the analysis. The majority protests that such a reading of Nixon is “ritualistic and unsensi-ble,” but it is difficult to squeeze a prophylactic exception out of the Court’s statement that “[a] statutory enactment that imposes [an employment bar] on named or identifiable individuals would be immediately constitutionally suspect.” Id. at 473, 97 S.Ct. 2777 (emphasis added).
Moreover, to the extent the Court considered congressional purpose in passing the law, it did so only after it had determined that the challenged burden did not fit the historical definition of punishment; its consideration of legislative intent was a means of ensuring that “new burdens and deprivations [are not] legislatively fashioned that are inconsistent with the bill of attainder guarantee.” Id. at 475, 97 S.Ct. 2777.
The Court began its analysis by asking whether the burden — the confiscation of presidential records — fell into the category of “immediately suspect” punishments, such as a bar to employment. After concluding that President Nixon “cannot claim to have suffered any of these forbidden deprivations at the hands of Congress,” the Court remarked that “our inquiry is not ended by the determination that the [statute] imposes no punishment traditionally * judged to be prohibited by the Bill of Attainder Clause.” Id. at 475, 97 S.Ct. 2777. Only then did the Court turn to legislative purpose — an inquiry that would not have been necessary if President Nixon had suffered one of the “forbidden” deprivations.
The Selective Service Court clarified this point. It explained:
Our inquiry does not end with a determination that [the statute] does not inflict punishment in its historical sense. To ensure that the Legislature has not created an impermissible penalty not previously held to be within the proscription against bills of attainder, we must determine whether the challenged statute can be reasonably said to further nonpunitive goals.
468 U.S. at 853-54, 104 S.Ct. 3348 (citing Nixon, 433 U.S. at 475-76, 97 S.Ct. 2777).
The majority’s reading of these cases is sadly ironic. In both Nixon and Selective Service, the Court sought to expand the protections of the Bill of Attainder Clause by looking to legislative purpose. The Court’s concern was congressional creativity in dreaming up new burdens that fell outside the category of burdens historically deemed punitive; by considering legislative intent, the Court erected an additional safeguard to protect individuals from new types of con-gressionally-devised punishment.
The majority’s interpretation, by contrast, contracts the scope of the clause. The majority looks to legislative intent not to protect citizens from congressional overreaching, but as a means of empowering Congress to pass punitive laws it could not otherwise enact— simply by claiming an intent to “regulate” rather than punish. Thanks to the prophylactic exception, Congress may now single out individuals for punishments that were, until today, routinely held unconstitutional.
C.
In deeming nonpunitive a burden that the Nixon Court characterized as “unquestionably” punitive, 433 U.S. at 473, 97 S.Ct. 2777, the majority reasons that punishment is not really punishment if it is inflicted for preventive purposes. The majority concludes that “[although the Special Provisions may well constitute a legislative judgment that the BOCs currently have an inherent and natural potential to restrain competition by virtue of their local market power, the Act does not declare them monsters or otherwise seek to punish them on the basis of past conduct, and thus does not run afoul of the Bill of Attainder Clause.” The majority distinguishes between retribution (the imposition of a burden for wrongful past conduct) and prevention (the imposition of a burden to reduce the likelihood of future harms — here, antitrust violations).
*251 This distinction is flatly contradicted by Brown, which rejects such a cramped view of punishment and undermines the majority’s novel interpretation of the clause. In holding that an employment bar constituted punishment, even when imposed for prophylactic purposes, the Court explained:
It would be archaic to limit the definition of “punishment” to “retribution.” Punishment serves several purposes: retributive, rehabilitative, deterrent — and preventive. One of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment.
Historical considerations by no means compel restriction of the bill of attainder ban to instances of retribution. A number of English bills of attainder were enacted for preventive purposes — that is, the legislature made a judgment, undoubtedly based largely on past acts and associations ... that a given person or group was likely to cause trouble (usually, overthrow the government) and therefore inflicted deprivations upon that person or group in order to keep it from bringing about the feared event.
381 U.S. at 458-59, 85 S.Ct. 1707.
Consider a statute that sentences to death a named individual who announces that he has criminal tendencies — but has yet to commit a crime. Under the majority’s theory, this law is not a bill of attainder: It does not “seek to punish on the basis of past conduct,” and it serves a legitimate prophylactic function. This hypothetical illustrates the impossibility of confining the clause’s protections to retributive measures. As the Court explained, a burden is rendered no less punitive by being based on future, rather than past, wrongdoing.
In fact, the majority’s concession that “the Act may well constitute a legislative judgment that the BOCs currently have an inherent and natural potential to restrain competition” falls squarely within the Court’s description of a bill of attainder: when “the legislature [makes] a judgment ... that a given person or group [is] likely to cause trouble ... and therefore [inflicts] deprivations upon that person or group in order to keep it from bringing about the feared event.” Id. at 458-59, 85 S.Ct. 1707. Here, Congress made a legislative judgment that the BOC’s were likely to cause trouble— they were likely to commit antitrust violations — and inflicted deprivations (severe line-of-business restrictions) in order to keep the Baby Bells from bringing about the feared event. Accordingly, under a straightforward application of Brown, the “prophylactic exception” is a chimera, and the Special Provisions are a bill of attainder.
D.
In sum, the unbroken line of Supreme Court precedent compels the conclusion that the Special Provisions, because they impose an employment bar, constitute historical punishment forbidden by the Bill of Attainder Clause. The Court has never held that Congress can single out named individuals for burdens historically deemed punitive simply because legislators are animated by a well-meaning, regulatory spirit. Yet that is precisely what the majority holds today, sidestepping the Nixon Court’s statement, 433 U.S. at 473, 97 S.Ct. 2777, that this type of law is “immediately constitutionally suspect.”
II.
The Bill of Attainder Clause has long been regarded as protecting unpopular individuals or groups from trial-by-legislature. As the Court explained in South Carolina v. Katzenbach, 383 U.S. 301, 324, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), the clause protects those “who are peculiarly vulnerable to nonjudicial determinations of guilt.” A quick survey of the caselaw confirms this view: The clause has been invoked to rescue Confederates and Communists from congressional wrath.
And that is what makes the Bill of Attainder analysis so unusual in this context: The Baby Bells, represented by armies of lawyers and lobbyists, hardly fit anyone’s notion of a helpless victim. Moreover, there is evidence in the record that the Baby Bells, by their own account, prevailed in the legislative process. While their apparent consent to the Special Provisions does not estop them from *252 challenging the restrictions in this court, it certainly undercuts their claim to victimhood. As the majority notes, the Special Provisions were part of a larger quid pro quo.
But the Bill of Attainder Clause serves a dual purpose: Not only does it rescue individuals from trial-by-legislature, it also preserves the separation of powers. The clause is a check on Congress’s power to legislate; it forbids Congress from passing punitive laws that target individuals. Congress may, of course, pass laws conferring benefits on individuals, see Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 239 n. 9, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), but when it wishes to impose punishment, it must legislate in general terms and allow the judicial branch to decide which individuals have violated the laws and must be punished.
The Court explained the clause’s role in preserving the separation of powers most thoroughly in Brown—an opinion the panel majority tars as “somewhat aberrant.” The Court began its discussion by reviewing the history of the clause, describing it as a barrier “to ensure that the legislature would not overstep the bounds of its authority and perform the functions of the other departments.” 381 U.S. at 444, 85 S.Ct. 1707 (emphasis omitted). It then stated precisely why the statute, which imposed an employment bar on members of the Communist Party, violated the clause:
In [enacting the statute] Congress has exceeded the authority granted it by the Constitution. The statute does not set forth a generally applicable rule decreeing that any person who commits certain acts or possesses certain characteristics (acts and characteristics which, in Congress’ view, make them likely to initiate political strikes) shall not hold union office, and leave to courts and juries the job of deciding what persons have committed the specified acts or possess the specified characteristics. Instead, it designates in no uncertain terms the persons who possess the feared characteristics....
Id. at 450, 85 S.Ct. 1707.
The Court noted that Congress was free to pass laws weeding subversives out of the labor movement — only it had to do so . through generally applicable legislation, otherwise it overstepped its constitutional bounds. In language directly applicable to the instant ease, the Court explained that Congress “cannot specify the people upon whom the sanction it prescribes is to be levied. Under our Constitution, Congress possesses full legislative authority, but the task of adjudication must be left to other tribunals.” Id. at 461, 85 S.Ct. 1707.
Brown stands for the idea that the Bill of Attainder Clause protects not only individual liberty, but also the other branches of government. The clause, in other words, helps ensure that Congress does not encroach on the executive’s or judiciary’s turf. As the Court concluded, id. at 442, 85 S.Ct. 1707, “the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function.”
This is hardly a novel, twentieth-century interpretation. In one of the earliest bill-of-attainder cases, Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 136, 3 L.Ed. 162 (1810), Chief Justice Marshall explained that “[i]t is the peculiar province of the legislature, to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments.” In fact, this understanding predates even the Marshall Court:
Writings contemporary with the drafting of the Constitution express great concern lest the legislature assume the power to implement the total policy of government without the participation of the other branches, and support the thesis that the bill of attainder clause should be viewed as a limitation on legislatures fully as broad, and as necessary to the effective separation of powers, as that which has been imposed upon courts by article III.
Note, The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause, 72 Yale L.J. 330, 343 (1962) (cited with approval in Brown, 381 U.S. at 457 n. 32, 85 S.Ct. 1707). In.this *253 sense, even if the BOC’s somehow “consented” to Congress’s imposing the Special Provisions, that consent is as irrelevant as is a litigant’s “consenting” to subject-matter jurisdiction. Congress simply lacks the power to legislate in this way.
In enacting the Special Provisions, Congress adjudicated. It not only specified the sanction but also identified the specific corporations upon whom the sanction was to be levied — not coincidentally, the same corporations involved in the prior AT&T litigation. The Bill of Attainder Clause says that when Congress wishes to impose certain burdens historically deemed punitive, it can do so only through laws of general applicability. The actual application of these laws to specific parties must be left to the other branches of government. Congress runs afoul of the Bill of Attainder Clause when it enacts punitive legislation that targets certain entities — even where, as here, the punishment comes cloaked in the mantle of prophylactic economic regulation.
III.
The majority today opens a loophole in the Bill of Attainder Clause, allowing Congress to pass legislation that historically has been held unconstitutional. In doing so, the majority redefines our traditional understanding of the clause’s mandate: Congress cannot single out an individual and deprive him of his life, liberty, or freedom to work. Because the Telecommunications Act’s “Special Provisions” amount to a bill of attainder, I respectfully dissent.